**Judith STEEVES, in her Capacity As Guardian of Gary W. Ames, et al., Plaintiffs**

v.

**CITY OF ROCKLAND, et al., Defendants.**

**Civil No. 08–50–P–JHR.**

United States District Court, D. Maine.

Feb. 18, 2009.

Andrews B. Campbell, Campbell Law Offices, Bowdoinham, ME, for Plaintiffs.

Edward R. Benjamin, Jr., Thompson & Bowie, Portland, ME, for Defendants.

### MEMORANDUM DECISION ON MOTION FOR SUMMARY JUDGMENT[1]

JOHN H. RICH, III, United States Magistrate Judge.

In this case arising from an encounter between plaintiff Gary W. Ames and Rockland, Maine police officer William Smith on June 25, 2006, the defendants have moved for summary judgment as to all claims against them. *See* Defendants' Motion for Summary Judgment ("Motion") (Docket No. 35) at 1, 7. For the reasons that follow, the Motion is granted as to Counts I, VI, VI I, VIII, IX, and XI I, as well as Count IV to the extent that it alleges liability on the part of the City of Rockland, Count V to the extent that it alleges violation of Ames' rights to be free from false arrest and imprisonment, and Count XIII to the extent that it alleges liability on the part of the City of Rockland, or defendants Ockenfels or Boucher. The Motion is otherwise denied. In addition, the plaintiffs are ordered to address questions raised below regarding the viability of Counts II and X, failing which those counts shall be dismissed.

## I. Summary Judgment Standards

### A. Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Santoni v. Potter,* 369 F.3d 594, 598 (1st Cir.2004). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez–Rivera v. Federico Trilla Reg'l Hosp. of Carolina,* 532 F.3d 28, 30 (1st Cir.2008) (quoting *Thompson v. Coca–Cola Co.,* 522 F.3d 168, 175 (1st Cir.2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.,* 515 F.3d 20, 25 (1st Cir.2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.,* 200 F.3d 1, 2 (1st Cir.1999) (citation and internal punctuation omitted); Fed.R.Civ.P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to

---

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have me conduct all proceedings in this case, including trial, and to order entry of judgment.

generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel,* 260 F.3d 27, 31 (1st Cir.2001) (citation and internal punctuation omitted).

## B. Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id.* The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(e). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Sánchez–Figueroa v. Banco Popular de Puerto Rico,* 527 F.3d 209, 213–14 (1st Cir. 2008).

## C. Requests To Strike

■ The defendants ask the court to strike the plaintiffs' statement of additional facts on the basis of non-conformance with Local Rule 56 to the extent that it simply incorporates by reference responses set forth in the plaintiffs' opposing statement of material facts. *See generally* Defendants' Responses to Plaintiff[s'] Statement of Additional Facts ("Defendants' Reply SMF") (Docket No. 50); Plaintiff[s'] Statement of Additional Facts ("Plaintiffs' Additional SMF"), commencing on page 54 of Plaintiffs' Statement of Disputed Material Fact, Objections to Defendant[s'] Amended Statement of Material Fact and Statement of Additional Facts ("Plaintiff's Opposing SMF") (Docket No. 47).

The plaintiffs are placed on notice that this practice does indeed transgress Local Rule 56(c), which requires that additional facts "each [be] set forth in a separately numbered paragraph[ ] and supported by a record citation[.]" Loc. R. 56(c). Nonetheless, I decline to strike the offending statements on that basis in this case, because, with some extra effort, it is possible to sort out which additional facts the plaintiffs intend to set forth. The defendants could have done so themselves but, instead, chose to respond only by way of requests to strike. Therefore, in accordance with Local Rule 56(f), in instances in which the defendants have tendered no substantive response, the plaintiffs' state-

ments of additional facts are deemed admitted to the extent that they set forth facts rather than arguments, and are supported by the record citations given.

## II. Factual Background

The parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, with disputes in cognizable facts resolved in favor of the plaintiffs as nonmovants, reveal the following facts relevant to this decision.[2]

### A. Ockenfels

Alfred Ockenfels began working as a patrol officer for the City of Rockland in 1979. Defendant[s'] Amended Statement of Material Facts ("Defendants' SMF") (Docket No. 40) ¶ 2; Plaintiffs' Opposing SMF ¶ 2.[3] During his employment with the City of Rockland Police Department, Ockenfels also served as a detective, a patrol sergeant, and deputy chief before becoming chief of police in 1989. *Id.* ¶ 3. Ockenfels served as Rockland's chief of police for 16 years, until he retired in 2005. *Id.* ¶ 4. He was succeeded as chief of police by the current chief, Bruce Boucher. *Id.* ¶ 5.

Ockenfels was serving as chief of police when William Smith was hired as a patrol officer by the City of Rockland in 2001. *Id.* ¶ 6. In Rockland, the chief of police does not have hiring or firing authority with regard to the city's police officers. Defendants' SMF ¶ 7; Affidavit of Alfred Ockenfels ("Ockenfels Aff.") (Docket No. 38) ¶ 2.[4] By City Charter, that authority is vested in the city manager. Defendants' SMF ¶ 8; Plaintiffs' Opposing SMF ¶ 8.[5]

2. In a discovery hearing held on August 18, 2008, I sustained the defendants' objections on relevance grounds to production of (i) all documents relating to a Maine Human Rights Commission ("MHRC") complaint filed by former Rockland police officer William Donnelly against the City of Rockland/Police Department ("Donnelly Complaint"), (ii) a report by William H. Dale, Esq., dated April 16, 2004, regarding Donnelly's claim of employment discrimination ("Dale Report"), and a statement by Rockland police officer Nellie Waterman regarding her employment with the Rockland Police Department ("Waterman Statement"), on the strength of representations made by the defendants' counsel as to the contents of those documents. At the conclusion of that hearing, I offered to review copies of the Dale Report and the Waterman Statement, which the defendants' counsel had provided to me *in camera*, and to notify counsel if my review persuaded me to modify my rulings. I now make explicit that my careful review of those documents did not persuade me to alter those rulings. Any marginal probative value of the Dale Report and the Waterman Statement, which focus on internal workplace matters, including claims of sexual and racial discrimination in the workplace, a hostile work environment, and retaliation for whistle blowing as to such matters, is outweighed by privacy concerns, including promises made to participants in the Dale investigation that their comments would be kept confidential. Consistent with those rulings, I have excluded the parties' proffered statements of fact to the extent that they discuss and rely upon the Donnelly Complaint, the Dale Report, and/or the Waterman Statement, including paragraphs 30 through 38 of the Defendants' SMF and the plaintiffs' responses thereto. *See* Defendants' SMF ¶¶ 30–38; Plaintiffs' Opposing SMF ¶¶ 30–38; Plaintiffs' Additional SMF ¶¶ 13–17.

3. I omit paragraph 1 of the Defendants' SMF, which the plaintiffs effectively controvert.

4. The plaintiffs purport to deny this statement in part; however, to the extent that their response is supported by the citations provided, it is in the nature of a qualification: that Ockenfels "evaluated Smith's application for employment[.]" Plaintiffs' Opposing SMF ¶ 7; Ockenfels Aff. ¶ 3.

5. The plaintiffs state that they admit this statement but then go on to cite material that they contend contradicts it. *See* Plaintiffs' Opposing SMF ¶ 8. The requirement to admit, deny, or qualify statements is central to Local Rule 56. *See* Loc. R. 56. I will hold the plaintiffs to their representation that they admit the underlying statement.

During Ockenfels' tenure, when the city had a vacancy in the police department, an applicant being considered for employment would have to pass a background check, a psychological evaluation, and a polygraph examination and then be interviewed by members of the city's personnel board. *Id.* ¶ 9. The applicant also would have to be a graduate of the Maine Criminal Justice Academy and be certified by the State of Maine to work as a law enforcement officer within the state. *Id.* ¶ 10. At the conclusion of this process, the personnel board would make a hiring recommendation to the city manager, who ultimately decided whether the applicant would be offered a position. *Id.* ¶ 11. This process was used when Smith applied for, and ultimately was offered, a position as a patrol officer in 2001. *Id.* ¶ 12.

Ockenfels has known Smith since he was a high school student because Smith worked a seasonal position as a traffic officer with the Rockland Police Department. *Id.* ¶ 13. Seasonal traffic officers are unarmed and are used to help direct traffic during times or events that attract large numbers of tourists to Rockland. *Id.* ¶ 14.[6] Ockenfels was aware that Smith

later was employed as a firefighter/paramedic with the Rockland Fire Department. *Id.* ¶ 15. He also was aware that, after leaving the fire department position, Smith became a deputy with the Knox County Sheriff's Office and then a police officer with the Town of Rockport Police Department before he applied for a job as a patrol officer with the City of Rockland in 2001. *Id.* ¶ 16.

At the time Smith applied for the job with Ockenfels' department in 2001, Smith was a graduate of the Maine Criminal Justice Academy and had approximately five years' experience as a law enforcement officer with Knox County and the Town of Rockport. *Id.* ¶ 17. Ockenfels was not aware of anything about Smith that would have made him unacceptable for the position of patrol officer. Defendants' SMF ¶ 18; Ockenfels Aff. ¶ 3.[7] In evaluating Smith's application for employment, Ockenfels confirmed that Smith had left each of his two prior jobs in law enforcement voluntarily, not as a result of termination by his employers. Defendants' SMF ¶ 19; Plaintiffs' Opposing SMF ¶ 19.[8] Ockenfels received no information in Smith's background check that

---

6. The plaintiffs purport to qualify this statement, but their qualification is unsupported by a record citation and sets forth argument rather than fact. *See* Plaintiffs' Opposing SMF ¶ 14. For those reasons, I disregard it.

7. The plaintiffs purport to deny this statement on the strength of three sentences that they incorporate by reference in paragraph 3 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 18; Plaintiffs' Additional SMF ¶ 3. None of the sentences is cognizable. The first sentence consists of argument rather than fact and is unsupported by the citation given. *See* Plaintiffs' Opposing SMF ¶ 18. The final two sentences hinge on a mischaracterization of the underlying record. The plaintiffs contend that Smith lied under oath in denying that he was the subject of any complaints or discipline, including any involving weapons in particular. *See id.* How-

ever, in the cited portion of Smith's deposition, he was asked: "Any complaints or charges against you in your history of working in law enforcement for using weapons inappropriately or challenged?" Deposition of William Smith ("Smith Dep."), Exh. 1 to Plaintiffs' Opposing SMF, at 34. While the question is awkwardly worded, it is reasonably clear that it pertained solely to complaints, discipline, or challenges for inappropriate use of weapons.

8. The plaintiffs purport to qualify this statement, incorporating the substance of their qualification in paragraph 4 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 19; Plaintiffs' Additional SMF ¶ 4. However, the qualification is argumentative and unsupported by the record citations provided and, on those bases, is disregarded.

would have indicated that Smith had a history of making unlawful arrests, using excessive force, or knowingly violating the rights of citizens. Defendants' SMF ¶ 20; Ockenfels Aff. ¶ 3.[9]

During the approximately four years that Ockenfels was Smith's supervisor, he found Smith to be very capable in carrying out his duties as a patrol officer. Defendants' SMF ¶ 21; Plaintiffs' Opposing SMF ¶ 21.[10] Smith was far more active in carrying out his duties than most other officers and, as a result, made significantly more arrests than some other officers in the department. *Id.* ¶ 22.[11] Ockenfels believed that, as a result of Smith's education, intelligence, and experience, Smith had all of the attributes needed to be a good patrol officer. *Id.* ¶ 23.

During Ockenfels' tenure as chief of police, Rockland officers were required to complete mandatory education specified by the Maine Criminal Justice Academy in order to maintain their certification as law enforcement officers. *Id.* ¶ 24. It was Ockenfels' responsibility, as the depart-ment head, to ensure that the officers serving under him completed all required education courses and maintained their certifications. *Id.* ¶ 25.

Rockland officers also had opportunities to take additional training that would enhance their ability to perform their duties and/or fulfill the needs of the department, including Crisis Intervention Training, which Smith completed prior to June 25, 2006. *Id.* ¶ 26. Smith testified that he took a weeklong Crisis Intervention Team course with the National Association of the Mentally Ill, but that it did not deal directly with situations in which a violent encounter takes place. Plaintiffs' Additional SMF ¶ 9 (incorporating Plaintiffs' Opposing SMF ¶ 26; Smith Dep. at 10–13). At deposition, he testified that he had learned through that training that "[t]he first thing in every situation is officer safety and the safety of anybody around." Plaintiffs' Additional SMF ¶ 9 (incorporating Plaintiffs' Opposing SMF ¶ 26; Smith Dep. at 15).[12]

Department officers also received training on the department's standard operat-

---

**9.** The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 5 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 20; Plaintiffs' Additional SMF ¶ 5. Nothing in the cited materials indicates that Smith had a history of using excessive force or of "knowingly" violating citizens' rights. *See* Exhs. A–D to Motion To Seal and Sealed Opposition Points ("Sealed Documents") (Docket No. 45). While the cited materials do reveal that Smith made an unlawful arrest while employed as a law enforcement officer for Knox County, *see* Exh. A to Motion To Seal, the plaintiffs adduce no evidence that Ockenfels received that information. Hence, they fail to controvert the underlying statement.

**10.** The plaintiffs purport to qualify this statement, incorporating the substance of their qualification in paragraph 6 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 21; Plaintiffs' Additional SMF ¶ 6. Their qualification is argumentative, and they fail to provide pinpoint citations as required by Local Rule 56(f), instead referencing the contents of an entire deposition transcript. *See* Plaintiffs' Opposing SMF ¶ 21. On those bases, it is disregarded.

**11.** The plaintiffs purport to qualify this statement, incorporating the substance of their qualification in paragraph 7 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 22; Plaintiffs' Additional SMF ¶ 7. Their qualification is argumentative, and they fail to provide pinpoint citations as required by Local Rule 56(f). On those bases, it is disregarded.

**12.** The plaintiffs' further assertion that the police department conducted no "other training for dealing with the mentally retarded unless part of an unidentified larger category of training," *see* Plaintiffs' Additional SMF ¶ 9 (incorporating Plaintiffs' Opposing SMF ¶ 26), is disregarded on the basis that it is not supported by the record citation given.

ing procedures, including its policy on dealing with persons exhibiting deviant behavior, among them mentally ill persons or persons with other mental disabilities. Defendants' SMF ¶ 27; Plaintiffs' Opposing SMF ¶ 27. That policy authorizes Rockland officers to take into custody a person who exhibits deviant behavior who has committed a crime, but the officer must then determine the most appropriate confinement condition to protect the public as well as satisfy the treatment needs of the deviant person. *Id.* ¶ 28. Neither the Response to Deviant Behavior policy nor the Arrest Procedures policy addresses how to distinguish mental health incidents from criminal acts, how to deal with persons with mental retardation, deafness, or disabilities, or how an officer on the beat ought to approach such individuals prior to making confinement decisions or decisions to use force. Plaintiffs' Additional SMF ¶¶ 10–11 (incorporating Plaintiffs' Opposing SMF ¶¶ 27–28; Exhs. 2–3 to Tower Dep.).

■ Legal issues that arise in police interaction with persons with mental disabilities are also part of the training on the Americans with Disabilities Act ("ADA") that all officers receive in the basic law enforcement course at the Maine Criminal Justice Academy. Defendants' SMF ¶ 29; Ockenfels Aff. ¶ 5.[13] Smith graduated from the Maine Criminal Justice Academy in November 1997. Plaintiffs' Additional SMF ¶ 12 (incorporating Plaintiffs' Opposing SMF ¶ 29; Affidavit of William Smith ("Smith Aff.") (Docket No. 37) ¶ 1).

Prior to June 25, 2006, Ockenfels was not aware of any facts that would have provided notice to the City of Rockland that there existed a problem with its officers, including specifically Smith, using excessive force against arrestees. Defendants' SMF ¶ 39; Ockenfels Aff. ¶ 7.[14]

13. The plaintiffs object to this statement on the basis that it is premised on inadmissible hearsay. *See* Plaintiffs' Opposing SMF ¶ 29. Their objection is overruled. I am satisfied that Ockenfels, as a former chief of police responsible for overseeing his officers' training and certification, has personal knowledge of training offered at the Maine Criminal Justice Academy, at least during the period of his tenure as chief of police.

14. The plaintiffs purport to deny this statement, citing the Donnelly Complaint as well as affidavits of Janice Hamilton, David Dean, and Jazman Nash. *See* Plaintiffs' Opposing SMF ¶ 39; Plaintiffs' Additional SMF ¶ 18. The plaintiffs' reference to the Donnelly Complaint, which has nothing to do with the use of excessive force or interaction between members of the Rockland Police Department and the public, is excluded, consistent with my ruling discussed above. Nash's allegations to the effect that Smith made sexually harassing comments to her and to other teenage girls commencing in the summer of 2001 have no bearing on the issues raised in this case. *See* Affidavit of Jazman Nash ("Nash Aff.") (Docket No. 51). Hamilton, an elderly woman on oxygen, alleges that while placing her under arrest in 2004 Smith ripped her portable oxygen bottle from her, causing her to pass out, that on another occasion, he barged into her home, snapping her door so hard that it snapped back and hit him in the arm, and that he has lied and been verbally abusive to her. *See* Affidavit of Janice Ann Hamilton ("Hamilton Aff.") (Docket No. 51). Dean alleges that Smith has been unprofessional and rude to him on many occasions, for example, pulling him over solely to harass him, and that he has observed Smith mistreat others, for example, throwing two teenage boys up against Smith's car and swearing at them. *See* [Affidavit of] David Dean ("Dean Aff.") (Docket No. 51). Even assuming *arguendo* the truth of Hamilton's and Dean's allegations, the plaintiffs adduce no evidence that Hamilton or Dean brought their allegations to Ockenfels' attention or, for that matter, to the attention of anyone in a position of authority with, or employed by, the City of Rockland or the Rockland Police Department. Nor is there any other evidentiary basis from which a fact-finder reasonably could infer that Ockenfels was or should have been aware of their allegations. The plaintiffs hence fail to controvert the underlying statement.

In the five-year period preceding Ames' arrest in 2006 during Ockenfels' tenure as chief of police, the only lawsuit alleging excessive force by Rockland police officers, *Dimmitt v. Ockenfels,* resulted in a summary judgment ruling in favor of the city and the officers involved. Defendants' SMF ¶ 40; Plaintiffs' Opposing SMF ¶ 40. While chief of police, Ockenfels also was aware of no facts to support a contention that the city's police officers discriminated against persons with disabilities in providing law enforcement services to the public. Defendants' SMF ¶ 41; Ockenfels Aff. ¶ 7.[15] At the time of Ames' arrest on June 25, 2006, Ockenfels was no longer the chief of police, having retired a year earlier. Defendants' SMF ¶ 42; Plaintiffs' Opposing SMF ¶ 42.

In Ockenfels' deputy's opinion, "his management style was authoritarian and all those below him were subjects." Plaintiffs' Additional SMF ¶ 8 (incorporating Plaintiffs' Opposing SMF ¶ 25; Deposition of Wallace Tower ("Tower Dep."), Exh. 4 to Plaintiffs' Opposing SMF, at 59). This had a "very negative impact on moral[e] in the agency" and "[c]reated an atmosphere of distrust, an atmosphere of individualism, a lack of team effort, reduced moral[e], excessive sick time, *et cetera, et cetera.*" Plaintiffs' Additional SMF ¶ 8 (incorporating Plaintiffs' Opposing SMF ¶ 25; Tower Dep. at 60).[16]

### B. Boucher

Boucher has been employed by the City of Rockland as the chief of police of the Rockland Police Department since 2005. Defendants' SMF ¶ 43; Plaintiffs' Opposing SMF ¶ 43. He held that position on June 25, 2006, the date of the arrest giving rise to the instant lawsuit. *Id.* ¶ 44.[17] Boucher is a graduate of the Maine Criminal Justice Academy and is certified as a law enforcement officer in the State of Maine. *Id.* ¶ 45. He is familiar with policies and procedures concerning arrest powers, the use of force in connection with arrests, and the training given to Rockland police officers in these areas since his employment there in 2005. *Id.* ¶ 46.

Before any police officer hired by the City of Rockland is allowed to patrol on his or her own, he or she must first graduate from the Maine Criminal Justice Academy and be certified by the State of Maine to perform the duties assigned to a patrol officer. *Id.* ¶ 47. In addition, all new Rockland officers must complete the department's field training program. *Id.* ¶ 48. The Rockland Police Department's field training program is overseen by supervisory personnel, who review the officers' performance. *Id.* ¶ 49. A full-time Rockland police officer oversees all new officers' activities as patrol officers during the field training period. *Id.* ¶ 50.[18] It is

15. The plaintiffs purport to deny this statement, objecting that the defendants rely on the Dale Report, which they refused to produce to the plaintiffs. *See* Plaintiffs' Opposing SMF ¶ 41. The objection is overruled. The defendants cite the Ockenfels Affidavit in support of the underlying statement, not the Dale Report.

16. The plaintiffs' further assertion that the City of Rockland had a pattern of abuse and discrimination that the chief was unable to control, *see* Plaintiffs' Additional SMF ¶ 8 (incorporating Plaintiffs' Opposing SMF ¶ 25), is argumentative, lacks any pinpoint citation, and in any event is not a fair characterization of the document cited. It is on those bases disregarded.

17. The plaintiffs qualify this statement, asserting, in cognizable part, that Ames was never charged with a crime following his arrest. *See* Plaintiffs' Additional SMF ¶ 19 (incorporating Plaintiffs' Opposing SMF ¶ 44; Smith Dep. at 89). The remainder of their qualification is argumentative and is either unsupported by the citation given or unsupported by any record citation, on the bases of which it is disregarded.

18. The plaintiffs purport to qualify paragraphs 49 and 50, *see* Plaintiffs' Opposing

only after the field training program is successfully completed that a newly-hired Rockland police officer may work patrol duties on his or her own. Defendants' SMF ¶ 51; Affidavit of Bruce Boucher ("Boucher Aff.") (Docket No. 39) ¶ 2.[19]

The Rockland Police Department has a policy concerning the response of its officers to persons exhibiting deviant behavior, which frequently includes persons suffering from mental illness or a mental disability. Defendants' SMF ¶ 52; Boucher Aff. ¶ 3.[20] Wallace Tower, deputy chief and training officer, testified that, depending on the circumstances, there are differences in dealing with persons with mental retardation. Plaintiffs' Additional SMF ¶ 20 (incorporating Plaintiffs' Opposing SMF ¶ 52; Tower Dep. at 31). In arresting persons with mental retardation, "it would depend on the circumstances" whether factors not present in dealing with a rational adult would apply. Plaintiffs' Additional SMF ¶ 20 (incorporating Plaintiffs' Opposing SMF ¶ 52; Tower Dep. at 32). Similarly, in dealing with a 10–year–old child rather than an adult, whether a different approach applies "depends on the circumstances." *Id.* Whether, when officers deal with those with mental retardation or who are mentally or emotionally challenged, it makes sense for them to move slowly and not excite the disturbed person again "[d]epends on the circumstances." Plaintiffs' Additional SMF ¶ 20 (incorporating Plaintiffs' Opposing SMF ¶ 52; Tower Dep. at 41).

The Rockland Police Department's officers are trained on the requirements of departmental policies. Defendants' SMF ¶ 53; Boucher Aff. ¶ 3.[21] The Rockland Police Department also has a Use of Force policy, which was in effect on June 25, 2006. Defendants' SMF ¶ 54; Boucher Aff. ¶ 3; Use of Force policy, Exh. A thereto.[22] This policy defines force as excessive "when its application is inappropriate to the circumstances, which may result in serious physical injury or death to a suspect." Plaintiffs' Additional SMF ¶ 22 (incorporating Plaintiffs' Opposing SMF ¶ 54; Use of Force policy § III(F)). The policy provides that, "[i]n evaluating the reasonable application of force, officers

SMF ¶¶ 49–50, but fail to supply any record citations in support of their assertions. I accept their observation that Boucher was not in office when Smith was hired, which is clear from undisputed facts set forth elsewhere in the parties' statements of material facts. However, their remaining assertions are disregarded.

19. The plaintiffs purport to deny this statement, asserting that Boucher was not in office when Smith was hired and that the Rockland Police Department did not conduct any other training for dealing with persons with mental retardation unless part of a larger category of training. *See* Plaintiffs' Opposing SMF ¶ 51. Neither assertion contradicts the underlying statement. What is more, the second assertion is unsupported by the record citation given. In the cited portion of the Smith deposition transcript, Smith was asked about policies and protocols, not about training. *See* Smith Dep. at 17–18.

20. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 20 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 52; Plaintiffs' Additional SMF ¶ 20. However, their assertions fail to controvert the underlying statement.

21. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 21 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 53; Plaintiffs' Additional SMF ¶ 21. However, their assertions mischaracterize Smith's responses to questions asked at his deposition and are on that basis disregarded.

22. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 22 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 54; Plaintiffs' Additional SMF ¶ 22. However, their assertions fail to controvert the underlying statement.

must consider factors such as: age, size, strength, skill level with Department weapons, state of health, and the number of officers opposing the number of suspects." *Id.* It does not address techniques for dealing with persons who are mentally ill or retarded. Plaintiffs' Additional SMF ¶ 22 (incorporating Plaintiffs' Opposing SMF ¶ 54; Use of Force policy). Per the policy, "[w]here lesser levels of force appear ineffective, officers may employ hands, fists, feet, knees, and so on in striking an adversary according to methods sanctioned through training." Plaintiffs' Additional SMF ¶ 22 (incorporating Plaintiffs' Opposing SMF ¶ 54; Use of Force policy § IV(C)).

Coverage for Rockland and its police officers for liability arising out of their law enforcement duties in 2006 was provided by the town's membership in the Maine Municipal Association ("MMA") Property & Casualty Pool, a self-insured municipal risk pool. Defendants' SMF ¶ 55; Plaintiffs' Opposing SMF ¶ 55.[23] Under the pool agreement, coverage for claims arising under state law is only available if the entity or the officers do not enjoy immunity under state law. Defendants' SMF ¶ 56; Boucher Aff. ¶ 5.[24] Coverage provided by the MMA is the only coverage available to the defendants in the instant mat-

ter. Defendants' SMF ¶ 57; Boucher Aff. ¶ 5.[25]

### C. Smith

Smith was hired as a Rockland police officer in 2001. Defendants' SMF ¶ 59; Smith Aff. ¶ 1.[26] Prior to his employment with the Rockland Police Department, Smith was employed by the Knox County Sheriff's Office and the Town of Rockport Police Department. Defendants' SMF ¶ 60; Plaintiffs' Opposing SMF ¶ 60. Prior to becoming a law enforcement officer, Smith was employed as a firefighter/paramedic with the Rockland Fire Department. *Id.* ¶ 61. Smith graduated from the Maine Criminal Justice Academy in November 1997. *Id.* ¶ 62. On June 25, 2006, he had been certified by the State of Maine to work as a law enforcement officer with the Rockland Police Department. *Id.* ¶ 63.

While at the Criminal Justice Academy, Smith was provided training on arrest powers, the lawful use of force in connection with arrests, and dealing with persons with various disabilities, including mental illness or mental disability. *Id.* ¶ 64.[27] Additionally, all officers attending the Maine Criminal Justice Academy's basic course receive training regarding the ADA, which would also include dealing with persons with mental disabilities. *Id.*

**23.** The plaintiffs' objection that this statement is one of law, not fact, *see* Plaintiffs' Opposing SMF ¶ 55, is overruled. The questions of whether the city was insured and by whom are ones of fact.

**24.** Although the plaintiffs purport to deny this statement, the insurance certificate language that they quote is consistent with it. *See* Plaintiffs' Opposing SMF ¶ 56.

**25.** The plaintiffs' objection that this statement is one of law and requires a legal conclusion, *see* Plaintiffs' Opposing SMF ¶ 57, is overruled. It is a statement of fact. I omit the plaintiffs' statement that the insurance policy provides $1 million in coverage under certain circumstances for the wrongful conduct of

Smith, *see* Plaintiffs' Additional SMF ¶ 23, sustaining the defendants' objection that no record citation is provided in support thereof, *see* Defendants' Reply SMF ¶ 23.

**26.** The parties dispute whether Smith was hired by the Rockland Police Department or the City of Rockland. *Compare* Defendants' SMF ¶ 59; Smith Aff. ¶ 1 *with* Plaintiffs' Opposing SMF ¶ 59; Ockenfels Aff. ¶ 2. Nothing turns on the dispute.

**27.** I omit additional assertions contained in paragraph 24, *see* Plaintiffs' Additional SMF ¶ 24, sustaining the defendants' objection that no record citation is provided, *see* Defendants' Reply SMF ¶ 24.

¶ 65.[28] Prior to June 25, 2006, the only training provided to Rockland officers on dealing with persons with mental disabilities was provided by the Maine Criminal Justice Academy. Plaintiffs' Additional SMF ¶ 24 (incorporating Plaintiffs' Opposing SMF ¶ 24; Tower Dep. at 28–29).

Prior to June 25, 2006, and while employed by the Rockland Police Department, Smith received training regarding the department's Use of Force policy and its policy on responding to persons exhibiting deviant behavior. Defendants' SMF ¶ 66; Smith Aff. ¶ 2.[29] Prior to June 25, 2006, Smith also received Crisis Intervention Training that was sponsored by the Rockland Police Department through a course provided by an outside agency, designed to provide additional skills to law enforcement officers dealing with persons in crisis, who frequently include persons with diminished mental capacity or mental illness. Defendants' SMF ¶ 67; Smith Aff. ¶ 2; Ockenfels Aff. ¶ 5.[30] As a result of his training in crisis intervention, Smith is a member of the Crisis Intervention Team, a group of certified officers specifically trained in the identification, handling, and disposition of individuals exhibiting signs of mental health crisis. Defendants' SMF ¶ 68; Plaintiffs' Opposing SMF ¶ 68.[31] Smith is also licensed as a paramedic and, because of that, probably has more training in medicine and medical conditions than any other Rockland police officer. Defendants' SMF ¶ 69; Boucher Aff. ¶ 3.[32]

28. The plaintiffs purport to qualify this statement but supply no record citation in support thereof. See Plaintiffs' Opposing SMF ¶ 65. Their qualification is on that basis disregarded.

29. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 25 of the Plaintiffs' Additional SMF. See Plaintiffs' Opposing SMF ¶ 66; Plaintiffs' Additional SMF ¶ 25. Their assertions, which were set forth in Plaintiffs' Additional SMF ¶ 9 to the extent cognizable and hence are not repeated here, do not controvert the underlying point.

30. The plaintiffs' objection to this statement on the bases that it is one of opinion and hearsay, see Defendants' Opposing SMF ¶ 67, is overruled. I am satisfied that Smith, who took the course, and Ockenfels, whose department sponsored it, would have personal knowledge of the aims of the course. The plaintiffs also deny the statement in part, incorporating the substance of their denial in paragraph 26 of the Plaintiffs' Additional SMF. See Plaintiffs' Opposing SMF ¶ 67; Plaintiffs' Additional SMF ¶ 26. However, their assertions to the effect that Smith was able to identify little that he had learned from the course, see id., which are set forth in Plaintiffs' Additional SMF ¶ 9 and hence are not repeated here, do not controvert the underlying statement.

31. The plaintiffs purport to qualify this statement, incorporating the substance of their qualification in paragraph 27 of the Plaintiffs' Additional SMF. See Plaintiffs' Opposing SMF ¶ 68; Plaintiffs' Additional SMF ¶ 27. To the extent that they object to the underlying statement on relevance grounds, see id., their objection is overruled. Smith's training clearly is relevant to their claims. I omit the plaintiffs' further assertions regarding Smith's arrest of 71–year–old Janice Hamilton in 2004, see Plaintiffs' Additional SMF ¶ 149, and alleged harassment or mistreatment of David Dean and Jazman Nash, see Plaintiffs' Additional SMF ¶ 151, sustaining the defendants' objections that the plaintiffs failed to file copies of those affidavits, see Defendants' Reply SMF ¶¶ 149, 151. While I later directed that copies of these missing affidavits be filed, and they were, see Docket No. 51, the defendants did not have the benefit of them while preparing their summary judgment papers. In any event, as discussed above, the Nash Affidavit is irrelevant to any issue raised in this case, and the Dean and Hamilton affidavits, standing alone, do not show that the City of Rockland or the Rockland Police Department was put on notice of the allegations raised therein.

32. The plaintiffs' objection to this statement on the grounds that it is a statement of inadmissible opinion, without foundation, and refers to training in about the year 1996, see Plaintiffs' Opposing SMF ¶ 69, is overruled. I am satisfied that Boucher has personal knowledge of the training of his officers and who among them has more training in medicine and medical conditions.

Prior to June 25, 2006, Boucher was not made aware of problems that existed involving Smith and Smith's knowledge of Maine's laws governing arrest and/or the use of force. Defendants' SMF ¶ 70; Boucher Aff. ¶ 4.[33] Prior to June 25, 2006, Boucher had not received information that he considered credible that Smith unlawfully exercised his arrest powers, needlessly used force against arrestees, or required additional training and/or supervision in those areas. Defendants' SMF ¶ 71; Boucher Aff. ¶ 4.[34] Prior to June 25, 2006, Boucher also had not received information that he considered credible indicating that

there was any widespread problem with other Rockland police officers concerning the use of their arrest powers or their use of force in connection with arrests. Defendants' SMF ¶ 72; Boucher Aff. ¶ 4.[35]

### D. Smith's Acquaintance with Ames and Kavanaugh

Prior to June 25, 2006, Smith was familiar with two people whom he regularly saw while patrolling downtown Rockland. Defendants' SMF ¶ 73; Plaintiffs' Opposing SMF ¶ 73.[36] These persons familiar to Smith, later identified as Gary Ames and Marie Kavanaugh, frequently walked

**33.** The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 28 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 70; Plaintiffs' Additional SMF ¶ 28. Their assertion that Boucher had Smith's personnel file available to him is not supported by the citation provided, which consists of the contents of that personnel file. *See* Plaintiffs' Opposing SMF ¶ 70; Sealed Documents, Exhs. A–D. The plaintiffs further assert that Tower, whom Boucher retained as deputy chief, was aware prior to Boucher's appointment that the department had issues "severe enough that [ ]a law firm was brought in March 2004 to evaluate the way the City of Rockland needed to overhaul the way it disciplined its police officers." Plaintiffs' Opposing SMF ¶ 70; Tower Dep. at 60–61. This testimony touches on the Dale investigation, which I have already determined has marginal probative value. In any event, the plaintiffs fail to provide evidence that Boucher was aware of Tower's information. *See id.* The substance of the denial is on those bases disregarded.

**34.** The plaintiffs purport to deny this statement for the reasons that they purported to deny paragraph 70 of the Defendants' SMF. *See* Plaintiffs' Opposing SMF ¶ 71. Their denial is disregarded for the same reasons as that denial. I have reworded the defendants' statement to the extent that they assert that Boucher had not received "credible information" on these subject matters. *See* Defendants' SMF ¶ 71. As the plaintiffs point out, whether information is credible is a jury question. *See* Plaintiffs' Opposing SMF ¶ 71. The defendants can at most fairly assert that

Boucher did not consider the information credible.

**35.** The plaintiffs purport to deny this statement on the basis of the existence of the Dale Report and significant issues about which Tower testified, and of the observation that it is a question of fact whether the information was credible. *See* Plaintiffs' Opposing SMF ¶ 72. As discussed above, the Dale Report does not bear on use of arrest powers or use of force in connection with arrest. The plaintiffs provide no pinpoint citations to the Tower deposition. In any event, in portions of the Tower deposition that they quote or cite elsewhere, Tower discussed problems in relationships among members of the department, not problems in officers' manner of effectuating arrests. I have reworded the defendants' statement to the extent that they assert that Boucher had not received "credible information" on these subject matters. *See* Defendants' SMF ¶ 72. As the plaintiffs point out, whether information is credible is a question of fact. *See* Plaintiffs' Opposing SMF ¶ 72. The defendants can at most fairly assert that Boucher did not consider the information credible.

**36.** The plaintiffs purport to qualify this statement, but fail to provide pinpoint citations to the portions of the Steeves and Ames interview tapes that they cite. *See* Plaintiffs' Opposing SMF ¶ 73. In any event, they have characterized their response as an admission, rather than qualification, of the underlying statement. *See id.* Their assertions are on those bases disregarded.

around the downtown area holding hands and giving all of the appearances of being a domestic couple. Defendants' SMF ¶ 74; Smith Aff. ¶ 3.[37] As of June 25, 2006, Smith believed that Ames and Kavanaugh were a couple with a long-standing romantic relationship. Defendants' SMF ¶ 76; Plaintiffs' Opposing SMF ¶ 76. Kavanaugh considers Ames her boyfriend of almost eight years, *id.* ¶ 77, although the relationship is not sexual, Plaintiffs' Additional SMF ¶ 33 (incorporating Plaintiffs' Opposing SMF ¶ 77; Deposition of Marie Kavanaugh ("Kavanaugh Dep."), Exh. 3 to Plaintiffs' Opposing SMF, at 35–36). She and Ames have been engaged for many years. Defendants' SMF ¶ 78; Plaintiffs' Opposing SMF ¶ 78. However, Smith did not take into consideration whether Ames and Kavanaugh were domestic partners in taking the action in question. Plaintiffs' Additional SMF ¶¶ 30, 32, 92 (incorporating Plaintiffs' Opposing SMF ¶¶ 74, 76, 132; Smith Dep. at 50–51).[38]

Although Smith regularly saw the couple walking downtown, it was usually from his cruiser while on patrol and, therefore, he had no real interaction with them. Defendants' SMF ¶ 75; Smith Aff. ¶ 3.[39] Ames' and Kavanaugh's appearance led Smith to believe that they may suffer from some type of mental condition, although he had no information regarding any formal diagnosis or reliable characterization of their level of cognitive functioning. Defendants' SMF ¶ 79; Smith Aff. ¶ 3.[40] Kavanaugh is a person with a mental handicap and has only a fourth-grade education. Plaintiffs' Additional SMF ¶ 117 (incorporating Plaintiffs' Opposing SMF ¶ 157; Kavanaugh Dep. at 5–6).

Smith used to see Ames almost daily. Plaintiffs' Additional SMF ¶ 31 (incorporating Plaintiffs' Opposing SMF ¶ 75; Smith Dep. at 38). During a taped conversation with Ames' sister, plaintiff Judith Steeves, following the incident in question, Smith told her: "You have always been good to me[,]" and "You guys have always been sweet to me." Plaintiffs' Additional SMF ¶ 31 (incorporating Plaintiffs' Opposing SMF ¶ 75; Track 3, undated recording of Smith conversation with Steeves ("Track 3"), CD attached as Exh. A to Smith Aff. ("CD"), at 1:00, 1:17). Smith also told Ames on the day of the incident in question: "I've never seen you that way before." Plaintiffs' Additional SMF ¶ 31 (incorporating Plaintiffs' Opposing SMF ¶ 75; Track 1, recording of Smith interview of Ames on June 26, 2006 ("Track 3"), CD, at 7:04). Ames testified that he told Smith following the incident, "Billy Smith, you broke my leg." Plaintiffs' Additional SMF ¶ 36 (incorporating Plaintiffs' Oppos-

---

37. The plaintiffs purport to deny this statement in part, incorporating the substance of their denial in paragraph 30 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 74; Plaintiffs' Additional SMF ¶ 30. However, none of their assertions contradicts the underlying statement.

38. The plaintiffs' objection that Smith's beliefs regarding Kavanaugh's and Ames' relationship are irrelevant because Smith testified that he did not take their status into consideration, *see* Plaintiffs' Opposing SMF ¶¶ 76–77, is overruled.

39. I omit the defendants' further statement that Smith had no detailed information about Ames or Kavanaugh, *see* Defendants' SMF ¶ 75, which the plaintiffs controvert.

40. The plaintiffs purport to deny this statement in part, incorporating the substance of their denial in paragraph 34 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 79; Plaintiffs' Additional SMF ¶ 34. Their denial is in the nature of an objection that the statement is irrelevant because it makes no difference whether Smith knew the exact level of cognitive impairment or hearing impairment. *See* Plaintiffs' Opposing SMF ¶ 79. The objection is overruled. The nature of Smith's understanding of Ames' disability is relevant to this action.

ing SMF ¶ 81; Deposition of Gary W. Ames ("Ames Dep."), Exh. 2 to Plaintiffs' Opposing SMF, at 20).[41]

Although Smith denies knowing that Ames was a person with mental retardation, he admits that it seemed to him that Ames and Kavanaugh were "mentally slow or challenged." Plaintiffs' Additional SMF ¶¶ 31, 34 (incorporating Plaintiffs' Opposing SMF ¶¶ [75], 79; Smith Dep. at 42, 45, 65). Smith had seen Ames wearing hearing aids. Plaintiffs' Additional SMF ¶¶ 31, 34–35 (incorporating Plaintiffs' Opposing SMF ¶¶ 75, 79–80; Smith Dep. at 48). In response to a comment by Steeves following the incident in question that Ames could "hear nothing," Smith stated: "I know." Plaintiffs' Additional SMF ¶¶ 31, 35 (incorporating Plaintiffs' Opposing SMF ¶¶ 75, 80; Track 3, CD, at 3:41).[42] Smith also can be heard on tape agreeing with Steeves following the incident that Ames has the mind of a 10–year–old. Plaintiffs' Additional SMF ¶¶ 30, 34 (incorporating Plaintiffs' Opposing SMF ¶¶ 74, 79; Track 3, CD, at 1:54).

Smith previously had been advised by Sergeant Dan Brown of the Rockland Police Department that, on one occasion, Brown had been dispatched to Ames' resi-

dence after his family reported Ames being violent and breaking things there. Defendants' SMF ¶ 82; Smith Aff. ¶ 3.[43] Smith was advised that, in the mid–1980s, there was an incident in which Ames had broken things at the house, although Ames was not violent against people. Plaintiffs' Additional SMF ¶ 37 (incorporating Plaintiffs' Opposing SMF ¶ 82; Deposition of Sergeant Daniel Brown ("Brown Dep."), Exh. 6 to Plaintiffs' Opposing SMF, at 11–12). Brown told Smith that Ames' demeanor caused him to leave his firearm outside of the residence to avoid introducing it into that volatile situation. Defendants' SMF ¶ 83; Smith Aff. ¶ 3.[44] However, Brown described Ames as a peaceful person in general who did not have a reputation for violent behavior. Plaintiffs' Additional SMF ¶¶ 37, 49 (incorporating Plaintiffs' Opposing SMF ¶¶ 82, 96; Brown Dep. at 12). Brown warned Smith to be cautious because Ames was a big man and there had been some prior history of smashing furniture, although Brown had "been able to talk with Gary." Plaintiffs' Additional SMF ¶ 39 (incorporating Plaintiffs' Opposing SMF ¶ 84; Brown Dep. at 13).[45] Brown's information was conveyed to Smith prior to Smith's arrest of Ames

---

**41.** I omit the defendants' statement that Ames did not know Smith, see Defendants' SMF ¶ 81, which the plaintiffs controvert.

**42.** I omit the defendants' statement that Smith was not aware prior to June 25, 2006, that Ames wore hearing aids or had any hearing limitations, see Defendants' SMF ¶ 80, which the plaintiffs controvert.

**43.** The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 37 of the Plaintiffs' Additional SMF. See Plaintiffs' Opposing SMF ¶ 82; Plaintiffs' Additional SMF ¶ 37. However, their assertions qualify, rather than controvert, the underlying statement.

**44.** The plaintiffs purport to deny this statement, incorporating the substance of their

denial into paragraph 38 of the Plaintiffs' Additional SMF, on the basis that Brown did not corroborate this information. See Plaintiffs' Opposing SMF ¶ 83; Plaintiffs' Additional SMF ¶ 38; see also Plaintiffs' Opposing SMF ¶ 82 (incorporated into Plaintiffs' Opposing SMF ¶ 83). However, the plaintiffs supply no pinpoint citation to the Brown deposition transcript and do not indicate that Brown was asked a question in response to which he could have been expected to corroborate that information. See Plaintiffs' Opposing SMF ¶¶ 82–83. The substance of their denial is on those bases disregarded.

**45.** I omit the defendants' version of Brown's warning to Smith, see Defendants' SMF ¶ 84, which the plaintiffs deny in part, see Plaintiffs' Opposing SMF ¶ 84, and substitute that of the plaintiffs.

on June 25, 2006. Defendants' SMF ¶ 85; Plaintiffs' Opposing SMF ¶ 85.[46]

### E. Incident of June 25, 2006

On June 25, 2006, Smith had just begun his shift as a bicycle patrol officer in the downtown Rockland area. *Id.* ¶ 86. Smith later told deputy chief Tower that passing motorists were yelling toward the direction of Ames and sounding their horns. Plaintiffs' Additional SMF ¶ 41 (incorporating Plaintiffs' Opposing SMF ¶ 87); Letter dated August 17, 2006, from Boucher to Ames & attachments thereto ("Boucher Report") (Docket No. 51) at [10].[47] Smith observed Ames dragging, or attempting to drag, Kavanaugh across a parking lot. Plaintiffs' Additional SMF ¶ 42 (incorporating Plaintiffs' Opposing SMF ¶ 88; Smith Dep. at 51). Kavanaugh was clearly trying to resist being pulled in the direction in which Ames was pulling her. Defendants' SMF ¶ 89; Smith Aff. ¶ 4; Kavanaugh Dep. at 11.[48]

Kavanaugh testified that Ames "was just pulling me a little bit[,]" approximately four inches, and that she had no fear that he would pull her to the ground. Plaintiffs' Additional SMF ¶¶ 42–43, 46, 50, 82 (incorporating Plaintiffs' Opposing SMF ¶¶ 88–89, 92, 99, 131; Kavanaugh Dep. at 41–42). She also testified that she could have pulled her wrist away if she wanted to. Plaintiffs' Additional SMF ¶¶ 43, 46, 51, 82 (incorporating Plaintiffs' Opposing SMF ¶¶ 89, 92, 100, 131; Kavanaugh Dep. at 38).[49] Ames had hold of her wrist by his finger, forefinger, and thumb. Plaintiffs' Additional SMF ¶¶ 42, 45, 82 (incorporating Plaintiffs' Opposing SMF ¶¶ 88, 91, 131; Kavanaugh Dep. at 43).[50]

Ames was pulling Kavanaugh because he wanted her to go to a family member's house. Defendants' SMF ¶ 90; Kavanaugh Dep. at 11.[51] Kavanaugh did not consider Ames to be forcing her to do anything physically but rather to be "just

---

**46.** The plaintiffs purport to qualify this statement, incorporating the substance of their qualification in paragraph 40 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 85; Plaintiffs' Additional SMF ¶ 40. They assert that Smith admitted that Ames was not arrested, although notwithstanding that admission, Ames was handcuffed, detained, and escorted with a police officer to the hospital. *See* Plaintiffs' Opposing SMF ¶ 85. Their assertion of the admission is not fairly supported by the portion of the Ames interview tape cited, in which Smith assured Ames following the latter's admission to the hospital, "You're not under arrest right now." Track 1, CD, at 0:56. Smith did not tell Ames that he had never been arrested or would not in the future be arrested. *See id.* The substance of the qualification is on that basis disregarded.

**47.** I have consecutively numbered the pages of the Boucher Report and accompanying attachments and refer to those consecutively numbered pages rather than page numbers of the individual documents contained therein. I omit the plaintiffs' description of a portion of Smith's conversation recorded on Track 1, which is unsupported by a pinpoint citation.

*See* Plaintiffs' Additional SMF ¶ 41 (incorporating Plaintiffs' Opposing SMF ¶ 87). I also omit the defendants' description of the manner in which Smith's attention was drawn to Ames, *see* Defendants' SMF ¶ 87, which the plaintiffs controvert, and substitute that of the plaintiffs.

**48.** I omit the defendants' further statement that Kavanaugh clearly was trying to break free, *see* Defendants' SMF ¶ 89, which the plaintiffs controvert.

**49.** I omit the defendants' statement that Kavanaugh was not able to get free from Ames when he was holding her wrist and hurting her, *see* Defendants' SMF ¶ 100, which the plaintiffs controvert.

**50.** I omit the defendants' version of what Smith observed, *see* Defendants' SMF ¶ 88, which the plaintiffs controvert.

**51.** I omit the defendants' further statements that Kavanaugh was refusing to go and that Ames was trying to force her to go, *see* Defendants' SMF ¶¶ 90, 92, substituting the plaintiffs' version of these events.

holding" her. Plaintiffs' Additional SMF ¶¶ 44, 123 (incorporating Plaintiffs' Opposing SMF ¶¶ 90, 165; Kavanaugh Dep. at 39).[52] She might have agreed to go with Ames, and nothing would have prevented the two from talking out the situation. Plaintiffs' Additional SMF ¶¶ 44, 82, 123 (incorporating Plaintiffs' Opposing SMF ¶¶ 90, 131, 165; Kavanaugh Dep. at 40–41). Ames did not feel that he was "forcing her to do anything" and did not believe that he was hurting her. Plaintiffs' Additional SMF ¶¶ 44, 46, 82 (incorporating Plaintiffs' Opposing SMF ¶¶ 90, 92, 131; Ames Dep. at 52, 59).[53]

Ames appeared enraged, and Kavanaugh appeared very frightened. Defendants' SMF ¶ 93; Smith Aff. ¶ 4.[54] Because Smith had seen Ames and Kavanaugh acting as a couple for such a long time, he believed that what he observed between them was a domestic dispute that had escalated into a physical confrontation. Defendants' SMF ¶ 132; Smith Aff. ¶ 6.[55]

When Ames had hold of Kavanaugh's wrist and was pulling her to go, she said words to the effect, "you are hurting me," or "don't hurt me." Defendants' SMF ¶ 94; Kavanaugh Dep. at 11, 65–66.[56] Smith testified that Kavanaugh did not have a chance to say anything at that time. Plaintiffs' Additional SMF ¶ 48 (incorporating Plaintiffs' Opposing SMF ¶ 94; Smith Dep. at 59–60). Kavanaugh testified that she said something like that, but said it in a nice way, that Ames did not hurt her, and that he never has hurt her. Plaintiffs' Additional SMF ¶ 48 (incorporating Plaintiffs' Opposing SMF ¶ 94; Kavanaugh Dep. at 11, 43, 56).[57] She and Ames are good to each other. Plaintiffs' Additional SMF ¶ 110 (incorporating Plaintiffs' Opposing SMF ¶ 148; Kavanaugh Dep. at 6).

Ames is a large man, weighing more than 200 pounds, and probably has a 100–pound weight advantage over Kavanaugh, who is very petite. Defendants' SMF ¶ 96; Plaintiffs' Opposing SMF ¶ 96. Ames is middle-aged and not in the best physical condition. Plaintiffs' Additional SMF ¶ 49 (incorporating Plaintiffs' Opposing SMF

52. I omit the plaintiffs' further statement that Kavanaugh did not consider herself to be "resisting," Plaintiffs' Additional SMF ¶ 44, which is not supported by the citation given.

53. I omit the defendants' version of events contained in Defendants' SMF ¶¶ 165–66, substituting that of the plaintiffs.

54. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 47 of the Plaintiffs' Additional SMF. See Plaintiffs' Opposing SMF ¶ 93; Plaintiffs' Additional SMF ¶ 47. Nonetheless, their assertions do not controvert that Smith perceived Ames and Kavanaugh this way. In addition, their assertion that there was no reason for Ames, who was on his way to share wrestling cards, to be enraged, is not supported by a pinpoint citation, and their assertion that Ames and Kavanaugh could "talk" things out is not supported by the citation given. See Plaintiffs' Opposing SMF ¶ 93. Their assertions are on those bases disregarded.

55. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 92 of the Plaintiffs' Additional SMF. See Plaintiffs' Opposing SMF ¶ 132; Plaintiffs' Additional SMF ¶ 92. However, their assertions do not controvert the statement.

56. The plaintiffs purport to deny this statement in part, incorporating the substance of their response in paragraph 48 of the Plaintiffs' Additional SMF. See Plaintiffs' Opposing SMF ¶ 94; Plaintiffs' Additional SMF ¶ 48. Nonetheless, their response is not a denial that Kavanaugh said words to that effect, but rather a qualification. To the extent that they allege that Smith told Tower that Kavanaugh had said to Ames, "You're hurting me," id., their qualification is unsupported by the citation given and hence is disregarded.

57. I omit the defendants' statement that Kavanaugh was being hurt by Ames at the time, see Defendants' SMF ¶ 98, which the plaintiffs controvert.

¶ 96; Deposition of Benjamin Marr ("Marr Dep."), Exh. 5 to Plaintiffs' Opposing SMF, at 30).[58] Kavanaugh weighs 110 pounds. Defendants' SMF ¶ 97; Plaintiffs' Opposing SMF ¶ 97. Ames pulled Kavanaugh some distance from where she was standing. *Id.* ¶ 99.

Ames admitted to his sister and guardian, Steeves, that he should not have taken Kavanaugh by her wrist. *Id.* ¶ 101. Within an hour of the incident, Ames did not remember pulling on Kavanaugh. Plaintiffs' Additional SMF ¶¶ 46, 52 (incorporating Plaintiffs' Opposing SMF ¶¶ 92, 101; Track 1, CD, at 2:17). He admitted to Smith only that he did "a little something wrong." Plaintiffs' Additional SMF ¶ 52 (incorporating Plaintiffs' Opposing SMF ¶ 101; Track 1, CD, at 2:50).[59]

Smith approached the couple and got off of his bicycle. Defendants' SMF ¶ 102; Plaintiffs' Opposing SMF ¶ 102. He threw his helmet and his bike down. Plaintiffs' Additional SMF ¶¶ 53, 93 (incorporating Plaintiffs' Opposing SMF ¶¶ 102, 133; Ames Dep. at 14). As he ran over to Ames, Kavanaugh asked Smith nicely not to hurt him, but Smith paid no attention. Plaintiffs' Additional SMF ¶ 53 (incorporating Plaintiffs' Opposing SMF ¶ 102; Kavanaugh Dep. at 16). Smith observed Ames let go of Kavanaugh momentarily but then take hold of her arm again as Smith approached them. Defendants' SMF ¶ 103; Smith Aff. ¶ 5.[60] Only about 15 seconds had passed since Smith dismounted his bicycle. Plaintiffs' Additional SMF ¶ 54 (incorporating Plaintiffs' Opposing SMF ¶ 103; Smith Dep. at 62). Smith admits that neither he nor Kavanaugh was in danger at that time. Plaintiffs' Additional SMF ¶¶ 54, 56 (incorporating Plaintiffs' Opposing SMF ¶¶ 103, 105; Smith Dep. at 61).

Smith ordered Ames to let go of Kavanaugh, and he did. Defendants' SMF ¶ 104; Plaintiffs' Opposing SMF ¶ 104. This indicated to Kavanaugh that Ames heard Smith's command. *Id.* ¶ 105.[61] Ames does not recall any "order." Plaintiffs' Additional SMF ¶¶ 55, 58 (incorporating Plaintiffs' Opposing SMF ¶¶ 104, 107; Ames Dep. at 15). Smith did not know the extent of Ames' deafness. Plaintiffs' Additional SMF ¶ 56 (incorporating Plaintiffs' Opposing SMF ¶ 105; Smith Dep. at 48). Smith did not ask Kavanaugh anything at the scene. Plaintiffs' Additional SMF ¶ 56 (incorporating Plaintiffs' Opposing SMF ¶ 105; Smith Dep. at 59–60). Ames denies that he was ever angry at Smith or said anything angry to him. Plaintiffs' Additional SMF ¶¶ 47, 57 (incorporating Plaintiffs' Opposing SMF ¶¶ 93, 106; Ames Dep. at 56). Ames did not initially see

58. The plaintiffs make this assertion about Smith, but it is clear that they meant to say Ames.

59. The plaintiffs' additional assertions that Ames' admission to his sister derived from fear, that he was bullied and intimidated by Smith into admitting that he had done something wrong, and that Smith put words into his mouth, *see* Plaintiffs' Additional SMF ¶¶ 46, 52 (incorporating Plaintiffs' Opposing SMF ¶¶ 92, 101) are argumentative and unsupported by the citations given and are on those bases disregarded.

60. The plaintiffs purport to deny this statement in part, incorporating the substance of their response in paragraph 54 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 103; Plaintiffs' Additional SMF ¶ 54. However, their assertions do not contradict the underlying statement.

61. The plaintiffs state that the question asked of Kavanaugh was suggestive and that her answer therefore is "subject to question." Plaintiffs' Opposing SMF ¶ 105. To the extent that this constitutes an objection, it is overruled. It is not clear from the citation given that Kavanaugh was sufficiently suggestible, and the question sufficiently suggestive, to undermine the reliability of her response as competent evidence in this case.

Smith approaching him. Plaintiffs' Additional SMF ¶ 57 (incorporating Plaintiffs' Opposing SMF ¶ 106; Kavanaugh Dep. at 10, 44).[62]

Ames yelled something incomprehensible and began running away from Smith, going around a building. Defendants' SMF ¶ 108; Smith Aff. ¶ 5; Kavanaugh Dep. at 10.[63] Ames stated that Smith jumped off his bike, threw his hat down, and ran after him. Plaintiffs' Additional SMF ¶¶ 60, 93 (incorporating Plaintiffs' Opposing SMF ¶¶ 109, 133; Ames Dep. at 15). He testified that he did not hear Smith say anything, and "I runned [sic] and he chased me.... I was scared ... of Billy Smith." Plaintiffs' Additional SMF ¶¶ 47, 60, 93 (incorporating Plaintiffs' Opposing SMF ¶¶ 93, 109, 133; Ames Dep. at 15–16). Ames ran because he was afraid that Smith believed that he had hurt Kavanaugh and would arrest him. Defendants'

SMF ¶ 110 Ames Dep. at 16–17.[64] Smith yelled for Ames to stop, however Ames kept running. Defendants' SMF ¶ 111; Smith Aff. ¶ 5.[65] Kavanaugh heard Smith order Ames to stop as he was running from Smith. Defendants' SMF ¶ 168; Plaintiffs' Opposing SMF ¶ 168. Ames says that he never heard Smith. Plaintiffs' Additional SMF ¶ 62 (incorporating Plaintiffs' Opposing SMF ¶ 111; Ames Dep. at 15).[66] When Steeves later told Smith that Ames could hear nothing, Smith responded, "I know." Plaintiffs' Additional SMF ¶ 62 (incorporating Plaintiffs' Opposing SMF ¶ 111; Track 3, CD, at 3:41).

Ames ran around the Unicel Store across the street. Defendants' SMF ¶ 112; Kavanaugh Dep. at 17.[67] Kavanaugh stated that Ames went "[j]ust around the corner a little bit, where the cell phone place was." Plaintiffs' Additional SMF ¶ 66 (in-

62. I omit the defendants' assertions that Ames turned and faced Smith, appearing to focus his rage on him, see Defendants' SMF ¶ 106, that Smith told Ames that he was going to have to go with him, see id. ¶ 107, and that Ames did not start running until after Smith arrived and told him to let go of Kavanaugh, see id. ¶ 109, which the plaintiffs controvert.

63. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 59 of the Plaintiffs' Additional SMF. See Plaintiffs' Opposing SMF ¶ 108; Plaintiffs' Additional SMF ¶ 59. However, their assertions do not controvert the underlying statement. In addition, their assertion that Smith testified that Ames took three steps, not that he ran around a building, see id., is unsupported by the citation given. It is on that basis disregarded.

64. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 61 of the Plaintiffs' Additional SMF. See Plaintiffs' Opposing SMF ¶ 110; Plaintiffs' Additional SMF ¶ 61. However, their assertion that, during Smith's interview of Ames following the incident, Ames initially denied doing anything wrong and Smith took advantage of his 10–year–old men-

tality to steer him to admit that he did something wrong, see Plaintiffs' Opposing SMF ¶ 110, is argumentative and unsupported by the citation provided. It is on those bases disregarded.

65. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 62 of the Plaintiffs' Additional SMF. See Plaintiffs' Opposing SMF ¶ 111; Plaintiffs' Additional SMF ¶ 62. However, their assertions do not controvert the underlying statement.

66. I omit the defendants' statement that Ames "disregarded" Smith's order, see Defendants' SMF ¶ 133, which the plaintiffs controvert.

67. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 63 of the Plaintiffs' Additional SMF. See Plaintiffs' Opposing SMF ¶ 112; Plaintiffs' Additional SMF ¶ 63. However, their first three assertions are argumentative and their fourth (that, according to Smith, Ames was 25 feet away from the street he is alleged to have run across) is not supported by the citation provided. Their assertions are on those bases disregarded.

corporating Plaintiffs' Opposing SMF ¶ 115; Kavanaugh Dep. at 48).[68] Although Kavanaugh lost sight of Ames at some point, she stated that she "was there and I watched [Smith] slam him down and jump on him." Plaintiffs' Additional SMF ¶ 66 (incorporating Plaintiffs' Opposing SMF ¶ 115; Kavanaugh Dep. at 49). Smith took a flying leap at Ames "through the air" and "diving[.]" Plaintiffs' Additional SMF ¶ 64 (incorporating Plaintiffs' Opposing SMF ¶ 113; Marr Dep. at 11). Bystander Benjamin Marr described Smith as having "jumped and wrapped his arms around" Ames' neck and "tackled him." Plaintiffs' Additional SMF ¶ 73 (incorporating Plaintiffs' Opposing SMF ¶ 122; Marr Dep. at 15).

Ames is a large man and was strong enough to have nearly carried Smith on his back as Smith struggled to stop him. De-fendants' SMF ¶ 138; Smith Aff. ¶ 6.[69] Ames took approximately three steps with Smith hanging on to his upper body. Defendants' SMF ¶ 116; Smith Aff. ¶ 5.[70] According to Marr, Smith was neither running nor walking when taken down by Smith but was maintaining a middle pace. Plaintiffs' Additional SMF ¶¶ 64, 73 (incorporating Plaintiffs' Opposing SMF ¶¶ 113, 122; Marr Dep. at 11). However, Ames did appear to Marr to be running away from Smith. Defendants' SMF ¶ 122; Marr Dep. at 15.[71]

Kavanaugh and Ames state that Smith kicked Ames. Plaintiffs' Additional SMF ¶¶ 68, 75, 101, 103–04, 115 (incorporating Plaintiffs' Opposing SMF ¶¶ 117, 124, 139, 141, 155; Ames Dep. at 46, 54; Kavanaugh Dep. at 18–19).[72] Smith later told Steeves that witnesses who said that they allegedly saw him kick Ames on the day of the

---

**68.** The plaintiffs expend some energy attempting to deny that Ames ran around a corner. *See* Plaintiffs' Opposing SMF ¶¶ 114–15; Plaintiffs' Additional SMF ¶¶ 65–66. However, their assertions in support of that denial either are argumentative or do not clearly controvert that he did. *See id.* In any event, they themselves rely on Kavanaugh's testimony that Ames did go "just around the corner a little bit." *See* Plaintiff's Opposing SMF ¶ 115. I omit the plaintiffs' statement that Summers Street is not on the side street to the parking lot where Ames was taken down by Smith but is a block away, *see* Plaintiffs' Additional SMF ¶ 99, sustaining the defendants' objection that the assertion is unsupported by any record citation, *see* Defendants' Reply SMF ¶ 99.

**69.** The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 100 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 138; Plaintiffs' Additional SMF ¶ 100. However, they fail to provide a pinpoint citation to the Marr deposition. *See id.* Their assertion is on that basis disregarded.

**70.** The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 67 of the Plaintiffs' Additional SMF. See Plaintiffs' Opposing SMF ¶ 116; Plaintiffs' Additional SMF ¶ 67. However, their assertions do not contradict that portion of the underlying statement set forth above.

**71.** The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 73 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 122; Plaintiffs' Additional SMF ¶ 73. Their reference to Track 1 of the CD is not supported by a pinpoint citation, *see id.*, and is on that basis disregarded. While, as the plaintiffs point out, *see id.*, Marr testified that Ames was walking at a middle pace rather than running or walking, *see* Marr Dep. at 11, Marr also testified that Ames appeared to be running away from Smith, *see id.* at 15. The latter testimony is not inconsistent with the former.

**72.** I omit the plaintiffs' further statement that when and whether Smith kicked Ames is a question of fact where different witnesses in different positions have different perceptions and different recollections, *see* Plaintiffs' Additional SMF ¶ 75, sustaining the defendants' objection that it is unsupported by any record citation, *see* Defendants' Reply SMF ¶ 75.

incident could be liable for making false statements. Plaintiffs' Additional SMF ¶ 68 (incorporating Plaintiffs' Opposing SMF ¶ 117; Track 1, CD, at 15:43).[73] Kavanaugh also observed Smith knee Ames in the back. Plaintiffs' Additional SMF ¶ 115 (incorporating Plaintiffs' Opposing SMF ¶ 155; Kavanaugh Dep. at 50).

Two observers, Marr and William Eustice, did not see Ames resisting Smith. Plaintiffs' Additional SMF ¶¶ 69, 97, 103–04 (incorporating Plaintiffs' Opposing SMF ¶¶ 118, 137, 141); Marr Dep. at 30; Victim/Witness Statement of William K. Eustice, Boucher Report at [37].[74] Smith was able to pull Ames' hands back and cuff them. Defendants' SMF ¶ 119; Plaintiffs' Opposing SMF ¶ 119. According to Marr:

> [Smith] tackled [Ames] to the ground. His glasses came off, and also rather aggressively when he handcuffed him[, Smith] put his knee on his back pretty hard, I thought way too hard, actually, and pulled his arms back, handcuffed him. [Ames] was crying, he had some blood on his face. To me it looked like a malicious attack.

Plaintiffs' Additional SMF ¶ 70 (incorporating Plaintiffs' Opposing SMF ¶ 119; Marr Dep. at 6). Smith denied the kneeing. Plaintiffs' Additional SMF ¶ 70 (incorporating Plaintiffs' Opposing SMF ¶ 119; Smith Dep. at 69). Ames' glasses fell off, and his false teeth came out. Plaintiffs' Additional SMF ¶ 70 (incorporating Plaintiffs' Opposing SMF ¶ 119; Kavanaugh Dep. at 55). Ames was not handcuffed standing up and then taken to the ground, as alleged in the complaint. Defendants' SMF ¶ 123; Marr Dep. at 18.[75]

When Smith collided with Ames as he caught up with him, Smith's momentum caused the two men to go down hard onto the pavement, with Smith on Ames' back. Defendants' SMF ¶ 125; Marr Dep. at 19.[76] Marr testified that "Smith's momentum [took Ames] down[.]" Plaintiffs' Additional SMF ¶¶ 76, 101 (incorporating Plaintiffs' Opposing SMF ¶¶ 125, 139; Marr Dep. at 19).[77] Marr did not observe anything before seeing Ames running and Smith chasing and tackling him. Defen-

73. I omit the plaintiffs' further statement that Smith attempted to intimidate witnesses who allegedly saw him kick Ames on the day of the incident, and that this further undermines the statement that it was a single leg hook and not a flying tackle that took Ames down, *see* Plaintiffs' Additional SMF ¶ 101 (incorporating Plaintiffs' Opposing SMF ¶ 139), which is argumentative and not a fair characterization of the cited portion of Track 1 of the CD.

74. I omit the defendants' statements that Ames continued to struggle, though only briefly, as Smith tried to handcuff him, *see* Defendants' SMF ¶ 118, and that after Smith caught him, Ames physically resisted his efforts to control him so that he could take him into custody, *see id.* ¶ 137, which the plaintiffs controvert.

75. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 74 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 123; Plaintiffs' Additional SMF ¶ 74. However, their assertions do not controvert the

statement. *See id.* I omit the plaintiffs' further statement that the record provides different observations and perceptions as to when Ames was initially or finally handcuffed, *see* Plaintiffs' Additional SMF ¶ 74, sustaining the defendants' objection that the statement is unsupported by any record citation, *see* Defendants' Reply SMF ¶ 74.

76. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 76 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 125; Plaintiffs' Additional SMF ¶ 76. However, their assertions do not controvert the underlying statement.

77. I omit the following statements of the defendants, substituting the plaintiffs' version of events: that (i) as Ames ran off, Smith chased him and grabbed him by the upper body when he caught up with him, *see* Defendants' SMF ¶ 113, (ii) Ames and Smith were around the corner when Smith got to Ames, *see id.* ¶ 114, (iii) when Ames ran around the corner

dants' SMF ¶ 126; Plaintiffs' Opposing SMF ¶ 126.[78]

Ames immediately stated that Smith had broken his leg. Defendants' SMF ¶ 120; Plaintiffs' Opposing SMF ¶ 120. Smith, a trained paramedic, immediately recognized at the scene of arrest that Ames' leg was broken. Defendants' SMF ¶ 129; Smith Aff. ¶ 7.[79] As soon as Ames was secured, Smith got up and looked around, putting his hands on his hips. Plaintiffs' Additional SMF ¶¶ 72, 81 (incorporating Plaintiffs' Opposing SMF ¶¶ 121, 130; Marr. Dep. at 25–26, 30). He looked like he was laughing. Plaintiffs' Additional SMF ¶¶ 72, 78, 81 (incorporating Plaintiffs' Opposing SMF ¶¶ 121, 127, 130; Kavanaugh Dep. at 50; Victim/Witness Statement of Charity

Wentworth, Boucher Report at [34]; Victim/Witness Statement of Jennifer Hall, Boucher Report at [35] ). Smith did not deny laughing. Plaintiffs' Additional SMF ¶ 72 (incorporating Plaintiffs' Opposing SMF ¶ 121; Smith Dep. at 70).[80] Smith called an ambulance. Defendants' SMF ¶ 121; Smith Aff. ¶ 5.[81]

The ambulance arrived very quickly. Defendants' SMF ¶ 128; Plaintiffs' Opposing SMF ¶ 128.[82] Smith kept Ames handcuffed, with his arms behind his back, while waiting for the ambulance to arrive and did not remove the handcuffs until Ames was in the ambulance. Plaintiffs' Additional SMF ¶ 80 (incorporating Plaintiffs' Opposing SMF ¶ 129; Smith Dep. at 87).[83] Smith intended to take Ames into

after Smith arrived, Kavanaugh lost sight of him, see id. ¶ 115, (iv) after Ames took three steps with Smith hanging onto his upper body, Smith hooked his left leg around Ames' leg, causing both of them to lose their balance and fall hard to the pavement, see id. ¶ 117, (v) when Smith used his leg to trip Ames, they landed awkwardly on the sidewalk, with Smith on top of Ames, see id. ¶ 139, (vi) while this mechanism of falling caused Ames to break his leg, this was entirely inadvertent, see id. ¶ 140, and (vii) Smith used only that degree of force that he thought was reasonable to overcome Ames' physical resistance to his efforts to take him into custody, see id. ¶ 141.

78. I omit the plaintiffs' statement that events may have occurred after the take-down that Marr did not observe, see Plaintiffs' Additional SMF ¶ 77, sustaining the defendants' objection that the assertion lacks a record citation, see Defendants' Reply SMF ¶ 77.

79. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 80 of the Plaintiffs' Additional SMF. See Plaintiffs' Opposing SMF ¶ 129; Plaintiffs' Additional SMF ¶ 80. However, their assertions, which in the main are arguments rather than proffers of fact, do not controvert the underlying statement.

80. The plaintiffs' further assertion that Smith did not deny questioning Ames when he was

standing up in cuffs with a broken leg, see Plaintiffs' Additional SMF ¶ 81 (incorporating Plaintiffs' Opposing SMF ¶ 130), is unsupported by the citation given and is on that basis disregarded.

81. I omit the defendants' statement that, other than tackling Ames to the ground and holding his knee against his back while handcuffing him, Smith did not do anything physically to Ames, see Defendants' SMF ¶ 124, which the plaintiffs controvert.

82. I omit the plaintiffs' statements that the ambulance took either a half hour or almost an hour to arrive, see Plaintiffs' Additional SMF ¶¶ 77, 79 (incorporating Plaintiffs' Opposing SMF ¶¶ 126, 128), which misread the cited ambulance record. That record indicates that the ambulance was called at 16:21 and arrived at the scene at 16:24, three minutes later. See Boucher Report at [31]. I also sustain the defendants' objection to a similar statement in paragraph 72 of the Plaintiffs' Additional SMF on the ground that no record citation is given. See Plaintiffs' Additional SMF ¶ 72; Defendants' Reply SMF ¶ 72.

83. I omit the defendants' statement that Smith tried to comfort Ames until the ambulance arrived, see Defendants' SMF ¶ 130, which the plaintiffs controvert.

custody for assault, but because of Ames' injury, Ames was instead transported directly to the hospital. Defendants' SMF ¶ 135; Smith Aff. ¶ 6.[84] Smith accompanied Ames in the ambulance and went into the emergency room with him. Plaintiffs' Additional SMF ¶ 95 (incorporating Plaintiffs' Opposing SMF ¶ 135; Smith Dep. at 71–72).[85] Consideration was given to charging Ames with domestic assault. Plaintiffs' Additional SMF ¶ 40 (incorporating Plaintiffs' Opposing SMF ¶ 85; Boucher Report at [20] ). However, Ames was not charged with any crime. Plaintiffs' Additional SMF ¶ 83; Defendants' Reply SMF ¶ 83.[86]

As Ames and Smith fell to the ground, Smith also struck the pavement very hard because of the awkward way they fell. Defendants' SMF ¶ 142; Smith Aff. ¶ 6.[87] Smith received cuts and scrapes to his knee and elbow when he fell to the pavement with Ames. Defendants' SMF ¶ 143; Plaintiffs' Opposing SMF ¶ 143.[88] Smith was seen at the hospital for what at first was thought to be a broken elbow. *Id.* ¶ 144.

After Smith was treated for his injuries at the hospital on June 25, 2006, he went to Ames' room to check on him. Defendants' SMF ¶ 145; Smith Aff. ¶ 7.[89] Ames

---

84. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 95 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 135; Plaintiffs' Additional SMF ¶ 95. However, their dispute appears to be one of semantics rather than substance. They state that Smith did take Ames into custody and, consistent with that custody, accompanied him in the ambulance and into the emergency room. *See* Plaintiffs' Opposing SMF ¶ 135. They further point out that Smith himself stated that Ames was placed under arrest and resisted arrest. *See id.* I do not perceive the defendants as denying that Smith initially arrested Ames, but rather as clarifying that Smith chose not to continue custody of Ames after their arrival at the hospital. Elsewhere, the plaintiffs assert that Smith inconsistently testified, on the one hand, that he was not trying to arrest Ames but merely wanted "to get his side of the story[,]" and, on the other hand, that he wanted to arrest Ames immediately for domestic assault. *See* Plaintiffs' Additional SMF ¶¶ 96, 103–04 (incorporating Plaintiffs' Opposing SMF ¶¶ 136, 141). The citations provided do not reveal such an inconsistency. Smith testified that, in addition to arresting him for the commission of a crime in Smith's presence, he wanted "to stop Mr. Ames, so I could at least get his side of the story." Smith Dep. at 66; *see also id.* at 81.

85. I omit the defendants' statements that (i) Smith observed Ames committing an assault against Kavanaugh, *see* Defendants' SMF ¶ 131, and (ii) because Smith witnessed the assault, he had the legal right to make a

warrantless arrest of Ames, *see id.* ¶ 136, which set forth statements of law rather than fact.

86. I omit the plaintiffs' further statement that the fact that Ames was not charged with any crime shows that there never was probable cause to believe that a crime had been committed, *see* Plaintiffs' Additional SMF ¶ 84, sustaining the defendants' objection that it contains no record citation, *see* Defendants' Reply SMF ¶ 84.

87. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 106 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 142; Plaintiffs' Additional SMF ¶ 106. However, their assertions consist of argument and supposition, not fact, and are on that basis disregarded.

88. The plaintiffs purport to qualify this statement, incorporating the substance of their qualification in paragraph 107 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 143; Plaintiffs' Additional SMF ¶ 107. However, their purported qualification is in the nature of argument and speculation, not fact, and is on that basis disregarded.

89. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 108 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 145; Plaintiffs' Additional SMF ¶ 108. However, their assertions either are not supported by the citations provided or are unsup-

was accompanied in his room by his mother and his sister, Steeves. Defendants' SMF ¶ 146; Plaintiffs' Opposing SMF ¶ 146. Smith had a tape recorder with him, and activated it to record their conversation just before stepping into the hospital room. Defendants' SMF ¶ 147; Smith Aff. ¶ 7.[90] When Smith spoke to Ames in his hospital room, Ames stated that he knew he had done something "a little wrong" and was running because he did not want to get arrested. Defendants' SMF ¶¶ 134, 149; Smith Aff. ¶ 6; Track 1, CD, at 2:49.[91] Ames admitted that he and Kavanaugh were having problems. Defendants' SMF ¶ 148; Track 1, CD, at 1:20.[92]

During the interview, when Smith told Ames that he was a big, strong guy, strong enough to carry Smith on his back for a few steps, Ames' only reply was to concede that he was "pretty rugged." Defendants' SMF ¶ 150; Plaintiffs' Opposing SMF ¶ 150.[93] When Smith told Ames that he knew that Ames and Kavanaugh lived together as boyfriend/girlfriend and began explaining the domestic violence law, nobody in the room corrected his mistaken belief about their living arrangement. *Id.* ¶ 151.[94] Ames admitted that he tried to force Kavanaugh to go to his mother's house. Defendants' SMF ¶ 152; Track 1, CD, at 9:19.[95] Ames admitted that Kavanaugh was scared. Defendants' SMF ¶ 153; Plaintiffs' Opposing SMF ¶ 153.[96]

ported by any citation, on the bases of which they are disregarded.

90. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 109 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 147; Plaintiffs' Additional SMF ¶ 109. However, their assertions consist of argument and, in the case of the final sentence, are unsupported by the citation provided, and are on those bases disregarded.

91. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraphs 94 and 111 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶¶ 134, 149; Plaintiffs' Additional SMF ¶¶ 94, 111. However, their assertions are in the nature of arguments and are not supported by the citations given. On those bases, they are disregarded.

92. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 110 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 148; Plaintiffs' Additional SMF ¶ 110. The first three sentences of their response constitute arguments, the fourth sentence is unsupported by any record citation, and the fifth sentence is unsupported by the citation provided, on the bases of which they are disregarded. The final sentence, while supported by the citation given to the Kavanaugh deposition, does not controvert the underlying statement.

93. The plaintiffs purport to qualify this statement, incorporating the substance of their qualification in paragraph 112 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 150; Plaintiffs' Additional SMF ¶ 112. However, their qualification is in the nature of argument and cannot be discerned to be supported by the citation given. It is on those bases disregarded.

94. The plaintiffs' objection that this failure to explain is irrelevant, *see* Plaintiffs' Opposing SMF ¶ 151, is overruled. The post-incident conversation is relevant, and these details help to convey the nature and setting of that conversation.

95. I omit a portion of paragraph 152 in which the defendants state that Ames admitted that Kavanaugh "got upset" about going to his mother's house, *see* Defendants' SMF ¶ 152, which is unsupported by the citation provided. The plaintiffs purport to deny paragraph 152, incorporating the substance of their denial in paragraph 113 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 152; Plaintiffs' Additional SMF ¶ 113. However, their assertions are in the nature of arguments and on that basis are disregarded.

96. The plaintiffs purport to deny this statement in part, incorporating the substance of their qualification in paragraph 114 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 153; Plaintiffs' Additional SMF ¶ 114. However, their statements do not con-

Ames said that Kavanaugh had slapped him in the face a month earlier and that "she gets angry, too." *Id.* ¶ 154.[97]

■ During the course of Smith's interview of Ames, Steeves asked Ames if Smith had kicked him, as she was told by someone that he had, and Ames replied that he did not remember. Defendants' SMF ¶ 155; Track 1, CD, 14:07.[98] Steeves stated that she was told by four people that they saw Smith kicking Ames. Plaintiffs' Additional SMF ¶ 115 (incorporating

Plaintiffs' Opposing SMF ¶ 155; Track 1, CD, at 13:47).[99] Smith told Steeves that it was "not good that those people are saying false stuff" and that they could be held liable for false allegations. Plaintiffs' Additional SMF ¶ 115 (incorporating Plaintiffs' Opposing SMF ¶ 155; Track 1, CD, 14:25, 15:50).[100] Steeves told Smith that Ames is bipolar. Defendants' SMF ¶ 156; Plaintiffs' Opposing SMF ¶ 156.[101]

Ames' leg was broken in two places in the incident, and he was in a rehabilitation

---

trovert the underlying assertion. In addition, their assertion that Ames was in the hospital with a broken knee, a broken leg, in major pain, and under major pain drugs is not supported by the citation given and is on that basis disregarded.

**97.** The plaintiffs purport to qualify this statement. *See* Plaintiffs' Opposing SMF ¶ 154. However, their assertion is argumentative and unsupported by any record citation, and on those bases is disregarded.

**98.** The plaintiffs purport to deny this statement in part, incorporating the substance of their response in paragraph 115 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 155; Plaintiffs' Additional SMF ¶ 115. However, their assertions do not controvert the underlying statement. In addition, the second sentence of the plaintiffs' response is argumentative and unsupported by any record citation, on the bases of which it is disregarded.

**99.** I omit paragraphs 157 through 173 of the Defendants' SMF, which describe portions of Smith's tape-recorded interview of Kavanaugh the day after the incident, *see* Defendants' SMF ¶¶ 157–73, and the plaintiffs' responses thereto, *see* Plaintiffs' Opposing SMF ¶¶ 157–73; Plaintiffs' Additional SMF ¶¶ 117–29, because they have no bearing on whether summary judgment should be granted. In so doing, I make no ruling on individual objections lodged in the plaintiffs' responses.

**100.** I omit the plaintiffs' further statement that Smith's interview of Ames and implicit threats to Steeves after the attack on Ames are outrageous, atrocious, and beyond the bounds of human decency in a civilized society, *see* Plaintiffs' Additional SMF ¶ 115, sus-

taining the defendants' objection that it is unsupported by any record citation, *see* Defendants' Reply SMF ¶ 115.

**101.** The plaintiffs' objection that this statement is hearsay, irrelevant, immaterial, and not an admission because not made by Steeves in her capacity as guardian, *see* Plaintiffs' Opposing SMF ¶ 156, is overruled. To the extent that the statement is offered for the truth of the matter asserted, the fact that Steeves had not yet been appointed Ames' guardian when she made it is irrelevant to its status as an admission of a party-opponent. *See* 30B Michael H. Graham, *Federal Practice and Procedure* § 7018, at 211–12 (interim ed. 2006) ("Rule 801(d)(2)(A) provides that if an individual has a representative capacity such as … guardian and the statement is offered against him in that capacity, the statement is admissible without reference to whether the individual was acting in a representative capacity in making the statement; all that is required is that the statement be relevant to representative affairs.") (footnotes omitted). The statement is relevant insofar as it bears on what Smith knew about Ames' mental state and when. To the extent that the plaintiffs incorporate the substance of their objection in paragraph 116 of the Plaintiffs' Additional SMF, *see* Plaintiffs' Additional SMF ¶ 116, they do not set forth any cognizable facts, *see* Plaintiffs' Opposing SMF ¶ 156. I omit the plaintiffs' further statement that Steeves was not guardian at the time of her interview by Smith, that it was not under oath, and that it is not admissible evidence, *see* Plaintiffs' Additional SMF ¶ 116, sustaining the defendants' objection that the assertion is unsupported by any record citation, *see* Defendants' Reply SMF ¶ 116.

facility for a year. Plaintiffs' Additional SMF ¶ 71 (incorporating Plaintiffs' Opposing SMF ¶ 120; Ames Dep. at 34–35; Boucher Report at [23]-[24] ).[102]

When Ames made a complaint about the use of force in connection with his arrest on June 25, 2006, Boucher had the matter investigated by the deputy chief of police, Tower, who reported his findings. Defendants' SMF ¶ 174; Plaintiffs' Opposing SMF ¶ 174. Boucher reviewed witness statements, narrative reports, and recorded interviews of Ames and Kavanaugh and concluded that the broken leg suffered by Ames as he was being arrested by Smith was inadvertent and not the result of any unlawful use of force against him. *Id.* ¶ 175. Notwithstanding that

deputy Tower is a training officer who considers "confrontation" the same thing as "de-escalation," Boucher adopted the report. Plaintiffs' Additional SMF ¶ 130 (incorporating Plaintiffs' Opposing SMF ¶ 175; Tower Dep. at 69, 80).[103]

By all accounts, Ames was involved in a physical altercation with his girlfriend that was witnessed by Smith. Defendants' SMF ¶ 176; Plaintiffs' Opposing SMF ¶ 176.[104] Ames and his girlfriend both apparently have diminished mental capacity, although Boucher does not know their exact level of cognitive functioning. *Id.* ¶ 177. Tower considered whether Smith had used excessive force, not whether he had violated Ames' rights as a disabled person under the Maine Human Rights

**102.** The plaintiffs state that Ames suffered a broken knee cap *and* that his leg was broken in two places in the incident. *See* Plaintiffs' Opposing SMF ¶ 120. However, the cited medical records indicate that an x-ray of his left knee revealed two fractures: "a displaced fracture of the lateral tibial plateau with an associated oblique fracture of the proximal fibula, which was also displaced." Boucher Report at [23]. The plaintiffs' further assertion that Ames suffered "permanent additional injuries," Plaintiffs' Opposing SMF ¶ 120, cannot be discerned to be supported by the citations given and is on that basis disregarded. I also omit the plaintiffs' statements that (i) Ames suffered serious bodily injury as a result of the incident when Smith took him to the ground, *see* Plaintiffs' Additional SMF ¶ 71, sustaining the defendants' objection that it is unsupported by any record citation, *see* Defendants' Reply SMF ¶ 71, (ii) Smith's broken leg, broken knee cap, and prolonged convalescence were known to Boucher and Tower to have occurred during Ames' take-down by Smith, *see* Plaintiffs' Additional SMF ¶ 155, sustaining the defendants' objection that it is unsupported by any record citation, *see* Defendants' Reply SMF ¶ 155, and (iii) Ames injured his leg because he was kicked by Smith, *see* Plaintiffs' Additional SMF ¶ 133 (incorporating Plaintiffs' Opposing SMF ¶ 178), which lacks any pinpoint citation.

**103.** I omit the defendants' statement that Ames attempted to flee when Smith inter-

vened to stop his assault against Kavanaugh and injured his leg when he and Smith fell hard and awkwardly to the pavement as Smith attempted to stop him, *see* Defendants' SMF ¶ 178, which the plaintiffs controvert. I also omit the defendants' statement that, while Ames may have diminished mental abilities, he is still a large man capable of criminal behavior such as assault against his girlfriend, *see id.* ¶ 179, sustaining the plaintiffs' objection that because Boucher does not know Ames' mental capacity, he is not competent to determine whether he is capable of criminal behavior, *see* Plaintiffs' Opposing SMF ¶ 179. I omit the stand-alone assertions set forth in paragraph 130 of the Plaintiffs' Additional SMF, *see* Plaintiffs' Additional SMF ¶ 130, sustaining the defendants' objections that they consist of opinions of counsel rather than fact and are unsupported by any record citation, *see* Defendants' Reply SMF ¶ 130, as well as paragraph 131 of the Plaintiffs' Additional SMF, *see* Plaintiffs' Additional SMF ¶ 131, sustaining the defendants' objections that it constitutes opinion of counsel rather than fact and is unsupported by any record citation, *see* Defendants' Reply SMF ¶ 131.

**104.** The plaintiffs purport to qualify this statement, *see* Plaintiffs' Opposing SMF ¶ 176, however their assertions are in the nature of arguments and are unsupported by any record citation. They are on those bases disregarded.

Act or the ADA. Plaintiffs' Additional SMF ¶ 132 (incorporating Plaintiffs' Opposing SMF ¶ 177; Tower Dep. at 23–24). Ames' complaint to the Rockland Police Department, completed by Peggy D. Rice, a disability advocate who listed her reasons for assisting Ames as his hearing impairment and mental retardation, alleged, *inter alia*, that Smith had known Ames for a long time and knew that he was disabled. Plaintiffs' Additional SMF ¶ 132 (incorporating Plaintiffs' Opposing SMF ¶ 177; Boucher Report at [4]-[5] ).[105]

Ames has had problems at times controlling his anger and getting angry with people. Defendants' SMF ¶ 180; Ames Dep. at 25.[106] However, Brown was unaware of any instance in which Ames had directed violence against a person, as opposed to smashing furniture. Plaintiffs' Additional SMF ¶ 136 (incorporating Plain-

tiffs' Opposing SMF ¶ 180; Brown Dep. at 10–14).[107] Ames recalls times when he had to be taken to the hospital because of how angry and threatening to people he had been. Defendants' SMF ¶ 182; Plaintiffs' Opposing SMF ¶ 182.[108] He heard voices for a long time and saw spots. *Id.* ¶ 185. The voices never told him to hurt somebody, himself, or his family. Plaintiffs' Additional SMF ¶ 141 (incorporating Plaintiffs' Opposing SMF ¶ 185; Ames Dep. at 30).[109]

Kavanaugh believes that Ames putting his hand on her arms when she did not want to go was wrong. Defendants' SMF ¶ 191; Plaintiffs' Opposing SMF ¶ 191.[110] Kavanaugh and Ames are still boyfriend and girlfriend today. *Id.* ¶ 192. Kavanaugh loves Ames and would do anything to help him, including helping him in this lawsuit. Defendants' SMF ¶ 193; Kavanaugh Dep. at 67.[111]

105. I omit the remainder of paragraph 132 of the Plaintiffs' Additional SMF, which in part consists of argument, in part lacks pinpoint citations, and in part does not fairly characterize the portions of the record cited.

106. The plaintiffs purport to deny this statement in part, incorporating the substance of their denial in paragraph 136 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 180; Plaintiffs' Additional SMF ¶ 136. However, their assertion does not contradict the underlying statement.

107. I omit the defendants' statement that Ames gets violent with people or things, *see* Defendants' SMF ¶ 181, sustaining the plaintiffs' objection that, in the cited portion of Ames' deposition transcript, he appears confused by the question, *see* Plaintiffs' Opposing SMF ¶ 181.

108. The plaintiffs purport to qualify this statement, incorporating the substance of their qualification in paragraph 138 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 182; Plaintiffs' Additional SMF ¶ 138. However, the citation given does not support the assertion that there was only one incident in the record, but rather that Brown knew of only one incident. Their qualification is on that basis disregarded. I omit the defendants'

statements concerning incidents of aggressive behavior that occurred subsequent to the incident in question, *see* Defendants' SMF ¶¶ 183–84, sustaining the plaintiffs' objection that they are irrelevant, *see* Plaintiffs' Opposing SMF ¶¶ 183–84.

109. I omit paragraphs 186 through 190 of the Defendants' SMF, which describe problems between Ames and Kavanaugh prior to June 25, 2006, and the plaintiffs' responses thereto, see Plaintiffs' Opposing SMF ¶¶ 186–90; Plaintiffs' Additional SMF ¶¶ 142–46, because they have no bearing on whether summary judgment should be ranted. In so doing, I make no ruling on individual objections lodged in the plaintiffs' responses

110. The plaintiffs purport to qualify this statement, incorporating the substance of their qualification in paragraph 147 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF ¶ 191; Plaintiffs' Additional SMF ¶ 147. However, their assertion is unsupported by the citation given and is on that basis disregarded.

111. The plaintiffs purport to deny this statement, incorporating the substance of their denial in paragraph 148 of the Plaintiffs' Additional SMF. *See* Plaintiffs' Opposing SMF

## F. Testimony of Plaintiffs' Expert

Depositions were taken, *inter alia,* of the plaintiffs' designated expert, Detective Sergeant Gilbert Turcotte. Plaintiffs' Additional SMF ¶ 1; Defendants' Reply SMF ¶ 1. The defendants have presented no challenge to the designation of Turcotte as an expert in the form of a *Kumho/Daubert* motion and have not qualified any expert in rebuttal. *Id.* ¶ 86.[112] During his deposition, Turcotte applied the lodestar principle that "excessive force is never acceptable." *Id.* ¶ 89.[113]

Turcotte served for 22 years in the United States Army, retiring as a sergeant major in 1987, having served in demolitions, operations, and intelligence. *Id.* ¶ 91. He worked for 39 months as a patrol officer for the Winthrop Police Department, then 12 years with the Kennebec Sheriff's Department as a patrol deputy, investigator, and criminal investigation department sergeant until 2002, at which time he worked for the Hallowell Police Department and as a hospital security guard. *Id.* From 2003 to the present, he has been a detective sergeant for the Winthrop Police Department. *Id.* He is a graduate of the Maine Criminal Justice Academy and takes mandatory education every year. *Id.* Both in the military and in the policing profession, he has exercised supervision over others, including patrol officers. *Id.* He has made more than 100 arrests. *Id.* He has been educated in the area of dealing with persons with disabilities. *Id.*[114]

In response to the plaintiffs' counsel's description of Ames' conduct on June 25, 2006, Turcotte testified: "I'm not sure there has been a crime committed. Does this person with mental retardation have the culpable state of mind to know that what he may be doing is criminal, but from what—the scenario you gave me, I don't see a crime having been committed." Plaintiffs' Additional SMF ¶ 82 (incorporating Plaintiffs' Opposing SMF ¶ 131; Deposition of Gilbert Turcotte ("Turcotte Dep."), Exh. 8 to Plaintiffs' Opposing SMF, at 21); *see also* Plaintiffs' Additional SMF ¶ 85.[115] Turcotte testified that, if he

¶ 193; Plaintiffs' Additional SMF ¶ 148. However, their assertions are argumentative and are either unsupported by any record citation or lack a pinpoint citation, on the bases of which they are disregarded. I also omit stand-alone assertions in paragraph 148, *see* Plaintiffs' Additional SMF ¶ 148, sustaining the defendants' objection that the plaintiffs cite inadmissible hearsay, newspaper articles, for the truth of the matter asserted. *See* Defendants' Reply SMF ¶ 148; *see also, e.g., Libertad v. Welch,* 53 F.3d 428, 443 n. 12 (1st Cir.1995) ("[N]ewspaper articles ... are hearsay, and thus inadmissible to prove the truth of the matters asserted therein.").

112. I omit the plaintiffs' statements that Turcotte is a modest individual who has devoted a lifetime to law enforcement, *see* Plaintiffs' Additional SMF ¶ 87, sustaining the defendants' objection that no record citation is provided, *see* Defendants' Reply SMF ¶ 87, and that Turcotte's experience and analysis highlight the material disputed facts of this case, *see* Plaintiffs' Additional SMF ¶ 88, sustaining the defendants' objection that this represents an opinion of counsel rather than a fact, *see* Defendants' Reply SMF ¶ 88.

113. I omit the plaintiffs' statement that Turcotte applied this principle to the specific situation of confrontation of the mentally retarded, *see* Plaintiffs' Additional SMF ¶ 90, sustaining the defendants' objection that it is unsupported by any record citation, *see* Defendants' Reply SMF ¶ 90.

114. I omit the plaintiffs' assertions that Turcotte "has significant expertise," sustaining the defendants' objection that this represents an opinion, not a fact, and that his expertise extends to police work involving the mentally challenged and the hearing impaired, sustaining the defendants' objection that this assertion lacks a record citation. *See* Plaintiffs' Additional SMF ¶ 91; Defendants' Reply SMF ¶ 91.

115. The defendants' objection to this statement on the ground that the hypothetical question posed to Turcotte omits material,

came upon a scenario such as that described, he would have talked to Kavanaugh before making an arrest or proceeding. Plaintiffs' Additional SMF ¶ 96 (incorporating Plaintiffs' Opposing SMF ¶ 136; Turcotte Dep. at 20–21, 39–40).

Turcotte also testified that use of force would not be justified in a hypothetical situation in which a mentally retarded man and woman were walking down the street and the man was tugging at her wrist. Plaintiffs' Additional SMF ¶ 103 (incorporating Plaintiffs' Opposing SMF ¶ 141; Turcotte Dep. at 14–15).[116]

### III. Discussion

The plaintiffs bring the following claims:

1. *Count I* (42 U.S.C. § 1983): that, in violation of Ames' Fourth, Fifth, and Fourteenth Amendment rights, prior to June 25, 2006, the City of Rockland, Ockenfels, and Boucher developed and maintained policies or customs in their discipline, supervision, and training of police officers that exhibited deliberate indifference to civilians' constitutional rights and were the moving forces behind Ames' injuries. *See* Complaint for Violations of Civil Rights and Pendent State Claims ("Complaint") (Docket No. 1) ¶¶ 39–56.

2. *Count II:* that the Maine Tort Claims Act, 14 M.R.S.A. § 8101 *et seq.* ("MTCA"), does not provide immunity to Smith for his actions, which were made in bad faith and exceeded his discretionary authority. *See id.* ¶¶ 57–62.

3. *Count III* (42 U.S.C. § 1983): that Smith used excessive force against Ames in violation of Ames' Fourth Amendment rights. *See id.* ¶¶ 63–70.[117]

4. *Count IV:* that Smith's use of excessive force constitutes an intentional tort under Maine law, with respect to which no

---

undisputed facts, *see* Defendants' Reply SMF ¶ 85, is overruled. The facts presented to Turcotte are sufficiently close to the plaintiffs' cognizable version of events to make his answer relevant for purposes of summary judgment.

**116.** I omit the plaintiffs' assertions that (i) Smith knew that Ames was retarded, deaf, and out of shape, yet jumped on him from behind, and had no excuse or reason not to know this conduct exposed Ames to the risk of seriously bodily injury or possibly death, *see* Plaintiffs' Additional SMF ¶ 103, which is unsupported by the citation given; (ii) Ames is a large, overweight individual who dresses oddly, and any reasonable person who observed him for a certain period of time would see that he was seriously mentally retarded, in very poor physical condition, and elderly and would know that to leap on his back and pull him to the ground could seriously injure him, *see id.* ¶ 98, sustaining the defendants' objection that this constitutes counsel's opinion, not fact, and is unsupported by any record citation, *see* Defendants' Reply SMF ¶ 98; and (iii) without having spoken to or attempted to speak to Kavanaugh, Smith had no cause to use such extreme and excessive physical force against Ames, *see* Plaintiffs' Additional SMF ¶ 102, sustaining the defendants' objection that the statement is unsupported by any record citation, *see* Defendants' Reply SMF ¶ 102.

**117.** The plaintiffs also allege in the body of Count III that Smith's use of excessive force violated Ames' Eighth Amendment right to be free from cruel and unusual punishment. *See* Complaint ¶ 65. The defendants do not construe Count III to allege an Eighth Amendment claim, *see* Motion at 6, and the plaintiffs do not press any such claim in opposing the defendants' bid for summary judgment as to all claims against them, *see* Introduction & Statement of Facts ("Response") (Docket No. 46) at 10–20. Any such claim accordingly is waived. *See, e.g., Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 678 (1st Cir.1995) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.") (citations and internal quotation marks omitted); *Shapiro v. Haenn,* 222 F.Supp.2d 29, 44 (D.Me.2002) (to survive summary judgment on certain count, "Plaintiff was required to inform the Court of the reasons, legal or factual, why summary judgment should not be entered.") (citation and internal quotation marks omitted).

MTCA immunity is available, and that the City of Rockland had a policy or custom of employing inadequately trained police officers, amounting to approval of the use of excessive force and causing Ames' injuries. *See id.* ¶¶ 71–77.

5. *Count V:* that, in violation of the Maine Civil Rights Act, 5 M.R.S.A. § 4682, Smith interfered with Ames' rights under the laws and constitution of the State of Maine to be secure in his person, to be free from unreasonable searches and seizures, to be free from excessive force, and to be free from false arrest and imprisonment. *See id.* ¶¶ 78–81.[118]

6. *Count VI:* that Smith violated the rights of Ames, a person with mental retardation, in contravention of 34–B M.R.S.A. § 5601 *et seq. See id.* ¶¶ 82–89.[119]

7. *Count VII:* that Smith's charging of Ames with domestic assault and resisting arrest constituted malicious prosecution. *See id.* ¶¶ 90–101.

8. *Count VIII:* that Smith arrested Ames in the absence of reasonable grounds to do so and used force disproportionate to that necessary to perform his duties, constituting false arrest and assault. *See id.* ¶¶ 102–10.

9. *Count IX:* that Smith's arrest and confinement of Ames without probable cause constituted false imprisonment. *See id.* ¶¶ 111–13.

10. *Count X:* that Smith negligently inflicted emotional distress on Ames. *See id.* ¶¶ 114–20.

11. *Count XI:* that Smith intentionally inflicted emotional distress on Ames. *See id.* ¶¶ 121–25.

12. *Count XII* (42 U.S.C. § 1983): that the City of Rockland maintained a policy or custom of deliberate indifference to the supervision and discipline of police officers and inadequate training, and a custom of abuse of the mentally retarded, the elderly, and men and women of color and of sexual abuse of the young and defenseless, all of which was "closely related" to Ames' injuries. *See id.* ¶¶ 126–48.

13. *Count XIII:* that the defendants' actions justify an award of punitive damages. *See id.* ¶¶ 149–51.

### A. Municipal Liability (Counts I, IV, and XII)

The defendants first seek summary judgment as to all municipal liability counts (Counts I, IV, and XII). *See* Motion at 7–13. In so doing, they construe the Complaint to name Ockenfels and Boucher only in Count I and only in their official capacities. *See id.* at 8. Suit against Ockenfels and Boucher in their official capacities is effectively a suit against the City of Rockland, not against Ockenfels and Boucher personally. *See, e.g., Will v. Michigan Dep't of State Police,*

---

**118.** The plaintiffs add, in the body of Count V, that the defendants were aware that excessive force was an issue in the Rockland Police Department. *See* Complaint ¶ 81. The defendants construe Count V to state a claim only against Smith, *see* Motion at 6, and the plaintiffs do not challenge that characterization, *see* Response at 10–20. Any claim against defendants other than Smith contained in Count V accordingly is waived. *See, e.g., Grenier,* 70 F.3d at 678; *Shapiro,* 222 F.Supp.2d at 44.

**119.** The plaintiffs allege in Count VI that Smith's asserted violation of 34–B M.R.S.A.

§ 5601 *et seq.* stemmed primarily from improper and inadequate training and encouragement from his superiors and that Smith acted with the consent and approval of the Rockland Police Department and his supervisors. *See* Complaint ¶¶ 86, 88. The defendants view Count VI as stating a claim only against Smith, *see* Motion at 6, and the plaintiffs do not challenge that characterization, *see* Response at 10–20. Any claim against defendants other than Smith contained in Count VI accordingly is waived. *See, e.g., Grenier,* 70 F.3d at 678; *Shapiro,* 222 F.Supp.2d at 44.

491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."); *Bisbal–Ramos v. City of Mayagüez*, 467 F.3d 16, 20 n. 1 (1st Cir.2006) ("[A] claim against Pérez in his official capacity is essentially a claim against the City[.]").

■ Although the plaintiffs indicate, in the caption of the Complaint, that Ockenfels and Boucher are sued in both their official and individual capacities, *see* Complaint at 1–2, they do not take issue with the plaintiffs' interpretation in their response, *see* Response at 10–20. Accordingly, I deem any suit against Ockenfels and Boucher in their individual capacities waived. *See, e.g., Grenier*, 70 F.3d at 678; *Shapiro*, 222 F.Supp.2d at 44.[120]

### 1. Federal Claims (Counts I and XII)

With respect to the plaintiffs' federal municipal liability claims (Counts I and XII), the defendants argue that:

1. The plaintiffs' municipal liability theory, especially as articulated in Count XII, is based on incorrect and/or unsubstantiated beliefs about Smith and perhaps other Rockland officers and incorrect inferences regarding the Dale Report, which had nothing to do with police interaction with citizens, disabilities, abuse of arrest powers, or the use of excessive force in connection with arrests. *See* Motion at 8–9.

2. Rockland police officers must graduate from the Maine Criminal Justice Academy and be certified by the State of Maine to perform the duties of patrol officers before they are allowed to patrol in their own cars. *See id.* at 9. Training continues after graduation, as required by the state

to maintain their certifications, on arrest powers, use of force, and the ADA. *See id.* Prior to 2006, Smith, a trained and certified paramedic as well as a police officer, had also received specialized crisis intervention training and was a member of the Crisis Intervention Team. *See id.*

3. To the extent that any claim is made concerning Smith's hiring, although none can be discerned from the Complaint, it cannot lie against the chiefs because hiring authority in Rockland is vested in the city manager, not in the police chief. *See id.* Moreover, any such claim has no merit. *See id.* At the time of Ames' arrest in 2006, Smith had completed five years of employment as a Rockland police officer without any evidence coming to the attention of either Ockenfels or Boucher that he posed a danger to the rights of the citizens of the city. *See id.* Nor did other officers' conduct afford notice of problems with arrest, use of force, or failure to accommodate disabilities. *See id.* at 9–10.

4. To the extent that the plaintiffs intended to make a claim under the ADA, no such claim is discernible in the Complaint. *See id.* at 10. In any event, even if such a claim had been properly pled, the only potentially viable theory would be that of a denial of reasonable accommodation. *See id.* In the circumstances presented, such a claim fails. *See id.* at 10–11. Smith did not use physical force against Ames because he misconstrued his disability as unlawful activity, but rather because Ames assaulted Kavanaugh in Smith's presence and then refused to submit to arrest. *See id.* at 11. The city therefore cannot be held liable under the ADA. *See id.* at 11–12. To the extent that the plaintiffs seek to hold the individual defendants liable for ADA violations, the ADA pertains only to

---

**120.** For reasons discussed below, even were such claims not waived, the plaintiffs would

not succeed in staving off summary judgment with respect to them.

governmental entities and not to individual city employees. *See id.*

5. There is no basis in fact or law to impose liability on a failure-to-train theory against the chiefs or the City of Rockland under 42 U.S.C. § 1983. *See id.* at 13. There has been no lack of training or supervision generally or of Smith in particular. *See id.*

The plaintiffs counter that:

1. The testimony of Smith and Tower establishes "a deliberate and conscious failure to adopt policies or to train on any criteria and procedures to determine how and when to arrest and when to accommodate the mentally retarded or hearing impaired." Response at 17 (emphasis omitted). Smith's much-vaunted CIT training taught him nothing about dealing with the deaf and mentally retarded on the street beyond protecting himself. *See id.* Deputy Chief Tower taught officers only that "everything depends on the circumstances." *See id.* at 17–18. Smith did not take into consideration that Ames was hearing impaired or retarded, check with Kavanaugh to see if she was assaulted, or question whether Ames was capable of having a culpable state of mind, as he would have done with proper training and supervision. *See id.*

2. They adduce sufficient facts to reveal a pattern of failure to adopt effective policies or training or to exercise supervisory responsibility for treatment of minorities. *See id.* at 19. Their evidence tending to show that the training program as a whole was faulty includes that concerning Smith's arrest of 71–year–old Janice Hamilton, the Donnelly Complaint's allegations concerning treatment of women of color, Jazman Nash's evidence concerning harassment of young women, and David Dean's evidence concerning the Rockland Police Department's ignoring of a complaint. *See id.* at 19–20 & n. 6.

3. They state a triable claim under the ADA on a "wrongful arrest" theory, *i.e.,* that Smith arrested Ames because of disability-related, non-criminal bipolar conduct. *See id.* at 14–16.

### a. Section 1983 Municipal Liability

As the First Circuit has observed:

> The Supreme Court, concerned that municipal liability based on fault by the City might collapse into de facto *respondeat superior,* has set a very high bar for assessing municipal liability under *Monell* [*v. Department of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)]. The alleged municipal action at issue must constitute a "policy or custom" attributable to the City. Further, the Supreme Court has imposed two additional requirements: 1) that the municipal policy or custom actually have caused the plaintiff's injury, and 2) that the municipality possessed the requisite level of fault, which is generally labeled in these sorts of cases as "deliberate indifference." Causation and deliberate indifference are separate requirements, although they are often intertwined in these cases.

*Young v. City of Providence ex rel. Napolitano,* 404 F.3d 4, 26 (1st Cir.2005) (citations omitted).

In the context of an allegation of failure to train, "deliberate indifference will be found where the municipality fails to provide adequate training notwithstanding an obvious likelihood that inadequate training will result in the violation of constitutional rights." *Whitfield v. Meléndez–Rivera,* 431 F.3d 1, 10 (1st Cir.2005).

A similar showing must be made with respect to claims of inadequate supervision and discipline. *See, e.g., DiRico v. City of Quincy,* 404 F.3d 464, 469 (1st Cir.2005) ("[T]he evidence was not sufficient to support Di Rico's argument that the City

exhibited deliberate indifference in training, supervising, or disciplining McNeil with respect to the use of force. Even assuming that the evidence suggested that the City's training, supervision, or discipline of McNeil was wanting, it did not indicate that the City was deliberately indifferent to the rights of its citizens. As to training, the evidence established that the City regularly gave McNeil copies of its policy on the use of force and provided him with formal instruction on the matter. And, although the City decided not to increase its supervision over or discipline McNeil after the Burke claim, the evidence does not indicate that its decision reflected deliberate indifference. The city simply opted not to take action against McNeil after receiving a single, unsubstantiated allegation of use of excessive force.") (citations and footnotes omitted).

■ The plaintiffs adduce no cognizable evidence that Smith, or Rockland police officers in general, were inadequately trained, disciplined, or supervised regarding the use of force, arrest powers, or treatment of citizens with disabilities, or that the city maintained inadequate policies or procedures addressing those matters. The plaintiffs either admit or fail to controvert the defendants' evidence that:

1. During Ockenfels' tenure, Rockland officers were required to complete mandatory education specified by the Maine Criminal Justice Academy in order to maintain their certification as law enforcement officers. *See* Defendants' SMF ¶ 24; Plaintiffs' Opposing SMF ¶ 24.

2. Rockland officers had opportunities to take additional training, including Crisis Intervention Training, which Smith completed prior to June 25, 2006. *See id.* ¶ 26.

3. Rockland officers received training in the department's standard operating procedures, including its policies on use of force and on dealing with persons exhibiting deviant behavior, among them mental-

ly ill persons or persons with other mental disabilities. *See id.* ¶ 27.

4. Legal issues that arise in police interaction with persons with mental disabilities are also part of the training on the ADA that all officers receive in their basic law enforcement course at the Maine Criminal Justice Academy. *See* Defendants' SMF ¶ 29.

5. Prior to June 25, 2006, Ockenfels was not aware of any facts that would have provided notice to the City of Rockland that there existed a problem with its officers, including specifically Smith, using excessive force against arrestees. *See id.* ¶ 39. While chief of police, Ockenfels also was aware of no facts to support a contention that the city's police officers discriminated against persons with disabilities in providing law enforcement services to the public. *See id.* ¶ 41.

6. Prior to June 25, 2006, Smith received training regarding the department's use of force policy and its policy on responding to persons exhibiting deviant behavior. *See id.* ¶ 66.

7. As a result of his training in crisis intervention, Smith is a member of the Crisis Intervention Team, a group of certified officers specifically trained in the identification, handling, and disposition of individuals exhibiting signs of mental health crisis. *See id.* ¶ 68; Plaintiffs' Opposing SMF ¶ 68. Smith, a licensed paramedic, probably has more training in medicine and medical conditions than any other Rockland police officer. *See* Defendants' SMF ¶ 69.

8. Prior to June 25, 2006, Boucher was not made aware of problems that existed involving Smith and his knowledge of Maine's laws governing arrest and/or the use of force. *See id.* ¶ 70. Nor had Boucher received information that he considered credible that Smith unlawfully exercised his arrest powers, needlessly used

force against arrestees, or required additional training or supervision in those areas, or that there was any widespread problem with other Rockland officers concerning the use of their arrest powers or their use of force in connection with arrests. *See id.* ¶¶ 71–72.

To the extent that the plaintiffs rely on the Dale Report and the Donnelly Complaint as evidence of a custom or policy of inadequate supervision, training, or discipline, their efforts miss the mark. As noted above, those materials deal with interdepartmental strife, not with officers' interaction with the public, and do not address use of force, arrest powers, or disability discrimination. The plaintiffs' reliance on the Hamilton, Nash, and Dean allegations likewise is misplaced. As noted above, Nash's allegation that Smith sexually harassed her and other girls has no bearing on the conduct alleged in this case. In addition, even assuming *arguendo* the truth of Hamilton's and Dean's allegations of mistreatment by Smith, there is no evidence that they brought them to the attention of the City of Rockland, the Rockland Police Department, or any other supervisory authority. Thus, their allegations cannot be said to have put the city, Ockenfels, or Boucher on notice of any asserted problem.

The plaintiffs do adduce evidence tending to suggest that (i) Smith either did not derive much from his crisis intervention training or remember much about it, *see* Plaintiffs' Additional SMF ¶ 9, (ii) Deputy Chief Tower, the department's training officer, repeatedly responded that "it would depend on the circumstances" when asked at deposition whether officers should deal differently with mentally retarded people than others, *see id.* ¶ 20, and (iii) Tower equated "de-escalation" with "confrontation," *see id.* ¶ 130. However, this testimony, standing alone, does not prove that the Rockland Police Department's underlying training or policies are deficient. In any event, even assuming *arguendo* that deficiencies exist, the plaintiffs do not show that any such deficiencies were (or should have been) so apparent to the City of Rockland, Ockenfels, or Boucher as to render any of those defendants deliberately indifferent to an obvious likelihood that the deficiencies would result in violation of Ames' or others' constitutional rights.

Finally, while the plaintiffs adduce evidence that, in the scenario posited by the plaintiffs' counsel, the plaintiffs' expert, Turcotte, did not see a crime having been committed, and Turcotte would have spoken to Kavanaugh before making an arrest or proceeding, *see id.* ¶¶ 82, 96, they do not adduce evidence that Smith's failure to handle the situation in the same manner as Turcotte was reflective of deficient training, supervision, or discipline or that any such deficiencies were (or should have been) so apparent to the City of Rockland, Ockenfels, or Boucher as to render any of those defendants deliberately indifferent to an obvious likelihood that the deficiencies would result in a violation of Ames' or others' constitutional rights.[121]

The defendants accordingly are entitled to summary judgment with respect to Counts I and XII.[122]

---

[121]. I agree with the defendants that the Complaint cannot fairly be read to state a municipal liability claim predicated on inadequate hiring. *See* Complaint ¶¶ 39–56, 126–48. In any event, the plaintiffs offer no response to the defendants' arguments that such a claim is either not pleaded or cannot survive summary judgment, *see* Motion at 9; Response at 17–20, thereby waiving any such claim, *see,*

*e.g., Grenier,* 70 F.3d at 678; *Shapiro,* 222 F.Supp.2d at 44.

[122]. Even assuming *arguendo* that the plaintiffs did not waive any claim against Ockenfels and Boucher in their individual capacities, they fall short of generating a triable issue of deliberate indifference on the part of either individual. "Under 42 U.S.C. § 1983

### b. ADA

The defendants contend that no ADA claim is discernible in the Complaint and, even if one were, summary judgment in their favor nonetheless would be appropriate. *See* Motion at 10–12. The plaintiffs respond that they do indeed press an ADA claim predicated on a so-called "wrongful arrest" theory, as to which they raise a triable issue. *See* Response at 14–16.

■■■■■ In the Complaint, the plaintiffs themselves describe Count I as predicated on 42 U.S.C. § 1983 and the Fourth, Fifth, and Fourteenth Amendments, and Count XII as predicated on 42 U.S.C. § 1983 and the Fourth Amendment. *See* Complaint at 13, 31. In the body of those counts, they neither mention the ADA nor allude to its elements. *Compare id.* ¶¶ 39–56, 126–48 *with Gohier v. Enright,* 186 F.3d 1216, 1219 (10th Cir.1999) (to make out a claim under the ADA, a plaintiff must show "(1) that he [or she] is a qualified individual with a disability; (2) that he [or she] was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability") (citation and internal quotation marks omitted). A plaintiff is not entitled to raise a new theory of liability, not detectable in the complaint, for the first time in opposition to a motion for summary judgment. *See, e.g., Logiodice v. Trustees of Me. Cent. Inst.,* 170 F.Supp.2d 16, 30–31 n. 12 (D.Me. 2001), *aff'd,* 296 F.3d 22 (1st Cir.2002). On that basis alone, the defendants are entitled to summary judgment with respect to the plaintiffs' belatedly-raised ADA claim.

■■■ Alternatively, notwithstanding the plaintiffs' argument to the contrary, *see* Response at 14–16, they do not make out a triable "wrongful arrest" ADA claim. In *Gohier,* the United States Court of Appeals for the Tenth Circuit described two potential theories of ADA–Title II liability in the context of an arrest: (1) "wrongful arrest," when the police "wrongly arrested someone with a disability because they misperceived the effects of that disability as criminal activity[,]" and (2) failure "to reasonably accommodate [a] person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees." *Gohier,* 186 F.3d at 1220–21. The plaintiffs contend that "Ames exhibited bipolar conduct which was not criminal and was discriminated against by reason of that disability." Response at 15. Yet there is no cognizable evidence that the conduct that Smith perceived as unlawful as he dismounted his bicycle on June 25, 2006, stemmed from bipolar disorder or from any other disability. The record thus is devoid of a basis on which a reasonable trier of fact could con-

---

... [a]bsent participation in the challenged conduct, a supervisor can be held liable only if (1) the behavior of his subordinates results in a constitutional violation and (2) the supervisor's action or inaction was affirmatively linked to the behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence of the supervisor amounting to deliberate indifference." *Bisbal–Ramos,* 467 F.3d at 24 (citation and internal quotation marks omitted). "Deliberate indifference will be found only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." *Id.* (citation and internal quotation marks omitted). There is no cognizable evidence that Ockenfels or Boucher was aware of facts tending to show that the training, supervision, or discipline of Smith, or of Rockland officers generally, was sufficiently deficient in the areas of arrest, use of force, or treatment of the disabled as to create an obvious likelihood of violation of citizens' constitutional rights.

clude that Smith misperceived the effects of a disability as criminal activity.

The defendants accordingly are entitled to summary judgment with respect to the belated ADA claim that the plaintiffs press.

### 2. Count IV (State Claim)

■ The defendants next seek summary judgment as to any state law claim against the City of Rockland asserted in Count IV of the Complaint, arguing, *inter alia,* that the city has no policy of liability insurance that would waive its MTCA immunity. *See* Motion at 13.

Pursuant to the MTCA, "all governmental entities" are immune from suit on tort claims seeking recovery of damages unless an exception codified at 14 M.R.S.A. §§ 8104–A or 8116 pertains. *See* 14 M.R.S.A. §§ 8103(1), 8104–A & 8116; *Richards v. Town of Eliot,* 2001 ME 132, ¶ 42, 780 A.2d 281, 295. Section 8104–A, which concerns (i) ownership, maintenance, or use of vehicles, (ii) construction, operation, or maintenance of public buildings, (iii) discharge of pollutants, and (iv) road construction and street cleaning or repair, is inapposite.

Section 8116 "provides that, to the extent a municipality has obtained insurance for tort claims against it, the municipality is liable to the limits of the insurance coverage." *Richards,* 2001 ME 132, ¶ 42, 780 A.2d at 295. "[T]he governmental entity against whom a claim is made bears the burden of establishing that it does not have insurance coverage for that claim." *Danforth v. Gottardi,* 667 A.2d 847, 848 (Me.1995). The plaintiffs fail to controvert the defendants' evidence that the City of Rockland participates in an insurance pool pursuant to which coverage for claims arising under state law is available only if the entity or the officers do not enjoy immunity under state law, and that this coverage is the city's sole insurance coverage. *See* Defendants' SMF ¶¶ 55–57.

The City of Rockland accordingly is entitled to summary judgment as to Count IV.

### B. Claims Against Smith (Counts II–XI)

As a threshold matter, the defendants seek summary judgment as to state law tort claims against Smith contained in Counts II, IV, and VII–XI on the ground that the plaintiffs failed to file a notice of claim within 180 days as required by 14 M.R.S.A. § 8107. *See* Motion at 14. Alternatively, with respect to those claims, they argue that:

1. There is no factual predicate for the claims of false imprisonment and malicious prosecution. *See id.*

2. Smith is entitled to absolute immunity pursuant to the MTCA for all state law tort claims against him. *See id.*

3. For purposes of the plaintiffs' intentional infliction of emotional distress ("IIED") claim, there is no triable issue whether Smith's actions "exceed[ed] all possible bounds of decency in a civilized community." *Id.* at 15 (quoting *Halco v. Davey,* 2007 ME 48, 919 A.2d 626).

The defendants next seek summary judgment as to the plaintiffs' state and federal excessive force claims against Smith on grounds that (i) Smith employed a reasonable level of physical force to take Ames into custody and cannot be held liable for conduct that was, at most, negligent and, (ii) alternatively, Smith is entitled to qualified immunity because a reasonable police officer could have concluded that the force used during the struggle was lawful in the circumstances. *See id.* at 16–18.

The defendants finally argue that Smith is entitled to summary judgment as to Count VI, alleging a violation of 34–B M.R.S.A. § 5601 *et seq.,* on the basis that the statutory scheme relied upon affords

no basis for recovery in these circumstances. *See id.* at 18–19.

### 1. Timeliness of MTCA Notice of Claim

The MTCA provides, in relevant part:

Within 180 days after any claim or cause of action permitted by this chapter accrues, or at a later time within the limits of section 8110, when a claimant shows good cause why notice could not have reasonably been filed within the 180-day limit, a claimant or a claimant's personal representative or attorney shall file a written notice containing:

A. The name and address of the claimant, and the name and address of the claimant's attorney or other representative, if any;

B. A concise statement of the basis of the claim, including the date, time, place and circumstances of the act, omission or occurrence complained of;

C. The name and address of any governmental employee involved, if known;

D. A concise statement of the nature and extent of the injury claimed to have been suffered; and

E. A statement of the amount of monetary damages claimed.

14 M.R.S.A. § 8107(1). Section 8110 provides:

Every claim against a governmental entity or its employees permitted under this chapter is forever barred from the courts of this State, unless an action therein is begun within 2 years after the cause of action accrues, except that, if the claimant is a minor when the cause of action accrues, the action may be brought within 2 years of the minor's attaining 18 years of age.

*Id.* § 8110.

The defendants assert that all tort claims against Smith are barred by the plaintiffs' filing of a notice of claim on February 26, 2007, beyond the 180-day window. *See* Motion at 14.[123] The plaintiffs rejoin that notice of claim was given within one month of Steeves' appointment as guardian of Ames and that, pursuant to 14 M.R.S.A. § 853, the time during which a mentally ill person may bring an action is not measured until the date the disability is removed. *See* Response at 10 n. 4. Alternatively, they argue that Ames' complaint resulting in the Boucher investigation constituted substantial notice for purposes of section 8107. *See id.*

▮ Section 853 is inapposite: it does not apply to claims brought pursuant to the MTCA. *See* 14 M.R.S.A. § 853; *McLaughlin v. Superintending Sch. Comm.,* 2003 ME 114, ¶ 18, 832 A.2d 782, 787–88 (noting that Legislature had amended sections 8107, 8110 of MTCA to align with section 853 and "conform the treatment of minors under the MTCA to their treatment with respect to other tort claims").

▮ Nonetheless, the plaintiffs correctly observe that the MTCA requires substantial, rather than perfect, notice compliance:

No claim or action shall be commenced against a governmental entity or employee in the Superior Court unless the foregoing notice provisions are substantially complied with. A claim filed under this section shall not be held invalid or insufficient by reason of an inaccura-

---

**123.** The defendants refer to a Notice of Claim attached to the Complaint. *See* Motion at 14. No such notice was filed with the Complaint in this court. *See* Docket No. 1. Nonetheless, the plaintiffs do not contest that they filed such a notice on that date, *see* Response at 10 n. 4, and for purposes of resolution of the instant motion, I accept that they did.

cy in stating the time, place, nature or cause of the claim, or otherwise, unless it is shown that the governmental entity was in fact prejudiced thereby.

14 M.R.S.A. § 8107(4).

■ Peggy D. Rice, an advocate for Ames, assisted him in filing a complaint with the City of Rockland on July 6, 2006, in which he alleged, *inter alia,* that Smith had slammed him down on the ground during the course of the June 25, 2006, incident and kicked him with his leg, that Ames' leg was broken in two places, that Smith had known Ames for a long time and knew that he was disabled, and that Smith used excessive force. *See* Boucher Report at [4]-[5]. In their reply brief, the defendants offer no argument that this complaint, filed less than a month after the incident in question, failed to afford them substantial notice or was otherwise so incomplete as to prejudice them. *See generally* Reply Brief in Support of Defendants' Motion for Summary Judgment ("Reply") (Docket No. 49). Indeed, they fail to address in any fashion the plaintiffs' arguments concerning the notice requirement. *See id.* They accordingly fall short of demonstrating Smith's entitlement to summary judgment on this ground.

### 2. Malicious Prosecution, False Imprisonment Claims

The defendants next alternatively seek summary judgment as to claims that Smith subjected Ames to false imprisonment and malicious prosecution on the basis of lack of a sufficient factual predicate, given that Smith transported Ames immediately to the hospital rather than maintaining custody of him and that Ames was not prosecuted for assault against Kavanaugh. *See* Motion at 14.

■ The defendants plainly are entitled to summary judgment as to the malicious prosecution claim (Count VII). To make out such a claim, a plaintiff must "prove not only that criminal proceedings were instituted against him without probable cause and with malice, but also show that he received a favorable termination of the proceedings." *Nadeau v. State,* 395 A.2d 107, 116–17 (Me.1978). Ames never was charged with a crime in connection with the incident in question. No proceedings were instituted against him, let alone terminated in his favor.

■ It is far less clear that the plaintiffs lack a factual predicate for their false imprisonment claim (Count IX), at least on the basis that the defendants articulate. While Smith did summon an ambulance, he also handcuffed Ames immediately after the take-down and, according to the plaintiffs, kept him handcuffed until he had been placed inside the ambulance. My research indicates that even this brief a restraint suffices to make out a claim of false imprisonment. *See, e.g., Ottenbacher v. City of Hoquiam,* 13 Wash.App. 752, 537 P.2d 862, 864, *review denied,* 86 Wash.2d 1003 (Wash.1975) ("We agree that an [u]nlawful restraint by police officers, even without formal arrest or imprisonment and for a short duration, may constitute a false imprisonment."). The defendants accordingly fall short of making a persuasive case for summary judgment as to the false imprisonment claim on this ground.

### 3. Availability of MTCA Immunity

The defendants next seek summary judgment as to all state law tort claims against Smith (Counts II, IV, and VII through XI) on the basis that the MTCA affords him absolute immunity with respect to the conduct alleged. *See* Motion at 14. Insofar as this argument targets Count VII it is moot, for I have ruled that the defendants otherwise are entitled to summary judgment with respect to that count.

With respect to the remaining counts in issue, section 8111(1)(C) of the MTCA affords absolute immunity to governmental employees for "[p]erforming or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid." 14 M.R.S.A. § 8111(1)(C). In addition, section 8111(1)(E) of the MTCA provides absolute immunity to governmental employees for "[a]ny intentional act or omission within the course and scope of employment; provided that such immunity does not exist in any case in which an employee's actions are found to have been in bad faith[.]" *Id.* § 8111(1)(E).

▮▮▮▮ For purposes of the MTCA, "[a] law enforcement official's use of force is a discretionary act." *Comfort v. Town of Pittsfield*, 924 F.Supp. 1219, 1236 (D.Me.1996). So, too, is an officer's decision to effectuate a warrantless arrest. *See, e.g., Hegarty v. Somerset County*, 848 F.Supp. 257, 269 (D.Me.1994), *aff'd in part, remanded in part on other grounds*, 53 F.3d 1367 (1st Cir.1995). Nonetheless, such immunity has been held inapplicable to the extent an officer's conduct is "so egregious that it clearly exceeded, as a matter of law, the scope of any discretion he could have possessed in his official capacity as a police officer." *Id.* (citation, internal quotation marks, and emphasis omitted).

▮▮▮▮ In Count IV, the plaintiffs allege that Smith employed excessive force against Ames. *See* Complaint ¶¶ 71–77. In Count II, they allege that Smith's use of excessive force reflected bad faith and exceeded the scope of his discretion, stripping him of MTCA immunity. *See id.* ¶¶ 57–62. The Law Court has clarified that the standard for deciding whether an officer accused of use of excessive force is

entitled to MTCA immunity is the same as that for analyzing whether he or she is entitled to qualified immunity with respect to a parallel federal Fourth Amendment claim. *See Smith v. Jackson*, 463 F.Supp.2d 72, 81 (D.Me.2006); *Richards*, 2001 ME 132, ¶ 32, 780 A.2d at 292. For reasons discussed below in the context of analyzing the defendants' bid for summary judgment as to the plaintiffs' Fourth Amendment claim, the defendants fall short of proving Smith's entitlement to immunity pursuant to the MTCA at this summary judgment stage of the proceedings.

▮▮▮▮ In Count VIII, the plaintiffs allege that Smith's arrest of Ames in the absence of reasonable grounds to do so constituted false arrest, and that the false arrest in turn constituted an assault. *See* Complaint ¶¶ 102–10. In this context, as in that of excessive force claims, the state borrows the federal framework for analysis of the availability of immunity. *See Smith*, 463 F.Supp.2d at 81. That framework consists of what the First Circuit has dubbed "a trifurcated inquiry":

> We ask, first, whether the plaintiff has alleged the violation of a constitutional right. If so, we then ask whether the contours of the right were sufficiently established at the time of the alleged violation. Finally, we ask whether an objectively reasonable official would have believed that the action taken or omitted violated that right.

*Acevedo–Garcia v. Monroig*, 351 F.3d 547, 563–64 (1st Cir.2003) (citation and internal quotation marks omitted). "On summary judgment on qualified immunity, the threshold question is whether all the uncontested facts and any contested facts looked at in plaintiff's favor show a constitutional violation." *Buchanan v. Maine*, 469 F.3d 158, 168 (1st Cir.2006).

"The elements of a false arrest claim are generally as follows: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the defendant had no privilege to cause the confinement." *Borlawsky v. Town of Windam*, No. CV–99–426, 2004 WL 1433634, at *4 (Me.Super.Ct. Mar. 30, 2004) (citation and internal quotation marks omitted). The cognizable evidence, viewed in the light most favorable to the plaintiffs, suffices to show false arrest. Smith intended to confine Ames, Ames was conscious of the confinement and did not consent to it, and the plaintiffs' expert, Turcotte, testified that, on the version of facts posited to him by the plaintiffs' counsel, he did not see a crime having been committed. The contours of the right to be free from false arrest were well established as of the time of this incident. *See, e.g., Thompson v. City of Portland*, 620 F.Supp. 482, 485–86 (D.Me.1985) (discussing causes of action under Maine law for false arrest, false imprisonment).

Nonetheless, an objectively reasonable officer could have believed that his arrest of Ames was privileged. It is either undisputed, or the plaintiffs do not effectively controvert, that one or more passersby were concerned enough about the altercation between Kavanaugh and Ames to call Smith's attention to it, *see* Plaintiffs' Additional SMF ¶ 41, that Smith observed Ames dragging, or attempting to drag, Kavanaugh across a parking lot, *see id.* ¶ 42, that Ames was pulling Kavanaugh by the wrist, *see id.*, that Ames is a large man and Kavanaugh a small woman, *see* Defendants' SMF ¶ 96; Plaintiffs' Opposing SMF ¶ 96, and that, to Smith, Ames appeared enraged and Kavanaugh appeared frightened, *see* Defendants' SMF ¶ 93. Further, while Smith had observed that Ames appeared mentally "slow," he did not know his exact level of cognitive functioning. *See id.* ¶ 79. An objectively reasonable officer witnessing this scene and possessing that information could have believed that Ames was committing the crime of assault against Kavanaugh. *See* 17–A M.R.S.A. § 207(1)(A) (a person is guilty of assault, a Class D crime, if "[t] he person intentionally, knowingly or recklessly causes bodily injury or offensive physical contact to another person."). In such circumstances, Maine officers are privileged to effectuate warrantless arrests. *See id.* § 15(1)(B) (extending authority to law enforcement officers to arrest without a warrant "[a]ny person who has committed or is committing in the officer's presence any Class D or Class E crime").[124]

The defendants accordingly are entitled to summary judgment as to Count VIII.

■ For similar reasons, the defendants are entitled to summary judgment as to Count IX, which asserts that Smith falsely imprisoned Ames by arresting and confining him without probable cause. *See* Complaint ¶¶ 111–13. "Under Maine law, false imprisonment involves the unlawful detention or restraint of an individual against his will." *Thompson*, 620 F.Supp. at 485 (citation and internal quotation

---

**124.** "For the purposes of subsection 1, paragraph B, criminal conduct has been committed or is being committed in the presence of a law enforcement officer when one or more of the officer's senses afford that officer personal knowledge of facts that are sufficient to warrant a prudent and cautious law enforcement officer's belief that a Class D or Class E crime is being or has just been committed and that the person arrested has committed or is committing that Class D or Class E crime." 17–A M.R.S.A. § 15(2). "An arrest made pursuant to subsection 1, paragraph B must be made at the time of the commission of the criminal conduct, or some part thereof, or within a reasonable time thereafter or upon fresh pursuit." *Id.*

marks omitted). Turcotte's testimony suffices to make out an underlying case of false imprisonment, and the contours of that tort were well established as of the relevant time. *See id.* Nonetheless, through the time that Smith released Ames from handcuffs, an objectively reasonable officer could have believed that he had probable cause to effectuate Ames' arrest for assault.

Turning to Count X, the plaintiffs allege negligent infliction of emotional distress ("NIED") predicated on Smith's commission of two underlying torts, the alleged false imprisonment and the alleged use of excessive force. *See* Complaint ¶¶ 114–20; *McDermott v. Town of Windham*, 204 F.Supp.2d 54, 71 (D.Me.2002) ("[T] he tort of negligent infliction of emotional distress requires either a unique relationship between the plaintiff and the defendant, or an underlying tort.") (citation and internal quotation marks omitted). Because one of the predicate torts, use of excessive force, survives summary judgment, the defendants fall short of demonstrating Smith's entitlement to summary judgment on the basis of MTCA immunity as to the NIED count.

▮ The defendants next seek summary judgment as to Count XI, the plaintiffs' IIED claim, on grounds that, as a matter of law, the plaintiffs' cognizable evidence falls short of demonstrating one of the requisite elements, that Smith's conduct exceeded "all possible bounds of decency in a civilized community[,]" and, in any event, Smith is entitled to immunity under the MTCA. *See* Motion at 15; *see also Curtis v. Porter*, 2001 ME 158, ¶ 10, 784 A.2d 18, 22 (to make out claim of IIED, plaintiff must show, *inter alia*, that "the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized com-

munity") (citation and internal quotation marks omitted).

The cognizable evidence, viewed in the light most favorable to the plaintiffs, suffices to make out an IIED claim. The plaintiffs have adduced evidence that, to the extent Smith witnessed a crime, it was a simple assault involving tugging on the wrist of an unwilling companion; that Smith knew that Ames was a mentally challenged middle-aged man who wore hearing aids; that, to stop Ames' flight, he not only jumped on him and threw him to the ground but also kicked him when he was down; that, as Ames cried, Smith kneed him in the back "way too hard," in the words of one observer; that the take-down appeared to this observer to be "a malicious attack[;]" that, upon finishing handcuffing Ames, Smith stood up, put his hands on his hips, looked around, and appeared to be laughing; that although Smith, as a paramedic, recognized that Ames' leg was broken, he did not release him from handcuffs until Ames was placed in an ambulance; and that Ames' leg was broken in two places as a result of the encounter, and he spent a year in a rehabilitation facility. *See* Plaintiffs' Additional SMF ¶¶ 31, 34, 42–43, 66, 68, 70–73, 80.

These facts paint a picture of outrageous conduct, utterly intolerable in a civilized society. At this stage of the proceedings, when for purposes of summary judgment the cognizable evidence must be construed in the light most favorable to the plaintiffs, MTCA immunity is unavailable to Smith.

### 4. Excessive Force Claims

The defendants next seek summary judgment as to the plaintiffs' state and federal claims of use of excessive force, set forth in Counts III and V, on grounds that (i) Smith cannot be subject to liability for excessive force under the Fourth Amendment based on negligent, rather than intentional conduct, and (ii) alternatively,

Smith is entitled to qualified immunity because a reasonable police officer could have concluded that the force used during the struggle was lawful in the circumstances. *See* Motion at 16–18. I address both arguments via the First Circuit's trifurcated qualified immunity analysis.[125]

 I turn to the first prong of the analysis, whether the plaintiffs have "asserted a cognizable violation of a constitutional right[.]" *Morelli v. Webster,* 552 F.3d 12, 22 (1st Cir.2009). The Fourth Amendment permits police officers to use "objectively reasonable" force to effectuate an arrest. *Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Peña–Borrero v. Estremeda,* 365 F.3d 7, 12 (1st Cir.2004) (citations and internal quotation marks omitted).

> The Supreme Court has furnished a non-exclusive list of criteria for determining the objective reasonableness of a police officer's use of force. These criteria include the severity of the crime at issue, the extent (if any) to which the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

*Morelli,* 552 F.3d at 23 (citation and internal quotation marks omitted). In addition, the seriousness of any injury sustained by an arrestee is relevant to consideration of whether excessive force was employed. *See, e.g., Bastien v. Goddard,* 279 F.3d 10, 14 (1st Cir.2002).

Taking these factors into consideration, a reasonable fact-finder could conclude that Smith employed excessive force

against Ames. The defendants contend that Ames had assaulted a female, posed a threat to her safety as well as that of Smith, and was actively resisting arrest or attempting to evade arrest by flight. *See* Motion at 16. But, as the plaintiffs counter, a reasonable fact-finder could conclude that Ames either had not committed a crime or was committing at most a simple assault, that Ames posed no danger to anyone at the time of the take-down, and that Ames ran out of fear and did not hear Smith's orders to stop. Further, the plaintiffs have adduced evidence that Smith saw Ames and Kavanaugh walking in town on many prior occasions, knew Ames' family, and was aware that Ames was a mentally challenged middle-aged man wearing hearing aids. In view of those circumstances, one could conclude that the conduct described by the plaintiffs, which included tackling Ames to the ground, kicking him when he was down, kneeing him hard in the back in the process of handcuffing him, and causing two leg fractures serious enough to necessitate one year of rehabilitation, constituted excessive force.

 On the second prong of the analysis, "[o]ur case law supplies a crystal clear articulation of the right, grounded in the Fourth Amendment, to be free from the use of excessive force by an arresting officer." *Morelli,* 552 F.3d at 23. "[T]here is no legitimate doubt that the right asserted here was clearly established." *Id.*

Here, as in *Morelli,* "[t]he question . . . reduces to whether [Smith's] use of excessive force constituted the type and kind of erroneous judgment that a reasonable police officer under the same or similar circumstances might have made." *Id.* As the First Circuit has recently explicated this "complicated" inquiry:

125. As noted above, federal qualified immunity analysis is dispositive of the question of whether Smith is entitled to immunity pursuant to the MTCA on the state law excessive force claim. *See Smith,* 463 F.Supp.2d at 81; *Richards,* 2001 ME 132, ¶ 32, 780 A.2d at 292.

By definition, excessive force is unreasonable force. But reasonable people sometimes make mistaken judgments, and a reasonable officer sometimes may use unreasonable force. In that event, qualified immunity gives an officer the benefit of a margin of error. Thus, defeating a qualified immunity defense requires a showing of an incremental degree of error—an incommensurate use of force beyond that needed to establish a garden-variety excessive force claim and, further, beyond the hazy border' [between excessive and acceptable force] noted by the *Saucier* [*v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) ] Court....

Looked at another way, qualified immunity is appropriate in an excessive force case when an officer correctly perceives all of the relevant facts but has a mistaken understanding as to the legality of his chosen level of force. Conversely, qualified immunity protection would not be available when the level of force chosen by the officer cannot in any way, shape, or form be justified under those facts.

*Id.* (citations and internal punctuation omitted).

■ I conclude that at this stage of the proceedings, when the cognizable evidence must be viewed in the light most favorable to the plaintiffs, Smith is not entitled to qualified immunity with respect to their excessive force claims. On their version of the facts, Smith's conduct does not fall on the hazy border between acceptable and excessive force, but rather in the excessive force domain. The conduct depicted by the plaintiffs, including the tackling, gratuitous kicking, and zealous kneeing, of a mentally challenged, middle-aged, partly deaf man who either had committed no crime or committed a relatively minor one, and posed no continuing danger to anyone, "cannot in any way, shape, or form be justified[,]" *id.*, even to the extent that Smith reasonably believed that Ames was fleeing to evade arrest.

The defendants fall short of showing entitlement to summary judgment as to the excessive force claims contained in Counts III and V.[126]

### 5. Claim Pursuant to 34–B M.R.S.A. § 5601 *et seq.* (Count VI)

■ The defendants next seek summary judgment as to Count VI on the ground that the statutory scheme that the plaintiffs invoke is inapposite. *See* Motion at 18–19. They are correct. In Count VI, the plaintiffs claim a right to recovery against Smith based on asserted violation of 34–B M.R.S.A. § 5601 *et seq. See* Complaint ¶¶ 82–89. However, the civil remedy afforded by 34–B M.R.S.A. § 5606 applies only to deprivations of rights granted by section 5605 to a "person receiving services" from the State Bureau of Mental Retardation or from an agency or facility licensed or funded to provide services to persons with mental retardation and autism. *See* 34–B M.R.S.A. §§ 5601(5–A), 5605, 5606(2). The rights conferred include the right to vote, to hold a job, to receive health care, to practice religion freely, and to be free from involuntary sterilization. *See id.* § 5605. There is no evidence that Ames is a "person receiving services" for purposes of the remedial scheme in question, and the plaintiffs offer no argument against summary judgment as to this count. *See* Response at 10–20. The defendants accordingly are entitled to summary judgment as to Count VI.

---

**126.** To the extent that the plaintiffs predicate Count V on alleged false arrest and imprisonment, *see* Complaint ¶ 79, the defendants are entitled to summary judgment for the reasons outlined above with respect to Counts VIII and IX.

## C. Punitive Damages Claim (Count XIII)

The defendants finally seek summary judgment as to Count XIII, requesting punitive damages against all defendants, on grounds that:

1. The City of Rockland, and Ockenfels and Boucher in their official capacities, cannot be liable as a matter of law for punitive damages under either state or federal law. *See* Motion at 20.

2. Ockenfels and Boucher are sued only in their official capacities and hence cannot be personally liable for punitive damages. *See id.* at 19.

3. On the undisputed evidence, Smith cannot be held liable for punitive damages under either the applicable federal standard, which requires a showing that the defendant's conduct "be motivated by evil motive or intent" or "involves reckless or callous indifference to federally protected rights of others[,]" or the applicable state standard, which requires "clear and convincing evidence" that the defendant acted with express or implied malice. *See id.* (citations and internal quotation marks omitted).

The City of Rockland, Ockenfels, and Boucher are entitled to summary judgment as to this count. I have already determined that no underlying claim against them survives summary judgment, and hence there is no predicate for the imposition of punitive damages liability as to them. The defendants' bid for summary judgment on Count XIII as to Smith is denied. A reasonable fact-finder, crediting the plaintiffs' version of events, could find that Smith exhibited reckless or callous indifference to Ames' federally protected rights and/or that he acted with implied malice.

## D. Viability of Counts II and X

While, as noted above, the defendants fail to make persuasive arguments that summary judgment should be rendered in their favor as to Counts II and X, I am concerned for other reasons that those counts may not state viable claims.

Count II, as I construe it, consists not of a claim that Smith engaged in conduct for which he should be held liable, but rather of an argument that, to the extent he chooses to assert the affirmative defense of entitlement to immunity pursuant to the MTCA, he cannot prevail. *See* Complaint ¶¶ 57–62; *see also, e.g., Cunningham v. Haza,* 538 A.2d 265, 266 (Me.1988) (immunity conferred by MTCA is an affirmative defense). An argument against an affirmative defense seemingly is not a claim as to which relief can be granted. *See* Fed. R.Civ.P. 12(b)(6).

In Count X, the plaintiffs seek to recover NIED damages predicated on Smith's commission of underlying torts. *See* Complaint ¶¶ 114–20. However, the Law Court has indicated that when a plaintiff is entitled to an award of damages for emotional distress via an underlying tort claim on which a NIED claim is predicated, the NIED claim is subsumed in the underlying tort claim. *See Richards,* 2001 ME 132, ¶ 34, 780 A.2d at 293. In at least one case, this court has granted summary judgment as to a NIED claim on that ground. *See McDermott,* 204 F.Supp.2d at 71. This raises a question as to whether the plaintiffs' NIED claim states a viable stand-alone claim.

The plaintiffs are directed to file on or before March 11, 2009, a supplemental brief, limited to 20 pages, addressing the question of whether Counts II and X assert viable claims in view of the concerns that I have raised, failing which those claims will be dismissed. The defendants may file a response, if any, limited to 20 pages, within 21 days of the filing of the plaintiffs' brief. The plaintiffs may file a reply brief, limited to seven pages, within

11 days of the filing of the defendants' response.

## IV. Conclusion

For the foregoing reasons, the defendants' motion for summary judgment as to all counts against them is **GRANTED** as to Counts I, VI, VII, VIII, IX, and XII, as well as Count IV to the extent that it alleges liability on the part of the City of Rockland, Count V to the extent that it alleges violation of Ames' rights to be free from false arrest and imprisonment, and Count XIII to the extent that it alleges liability on the part of the City of Rockland, Ockenfels, or Boucher, and otherwise **DENIED.**

The plaintiffs are **ORDERED** to address my questions regarding the viability of Counts II and X in the manner and on the schedule that I have outlined above, failing which those counts shall be dismissed.

I **DIRECT** the Clerk of the Court to seal this Memorandum Decision when docketed. The parties shall notify me within 48 hours of the docketing whether this Decision contains any confidential information that should remain sealed. If I do not hear from the parties within 48 hours, this Decision will be unsealed.

*SO ORDERED.*